577 A.2d 585

**Benjamin C. SCHECTER, M.D., Appellant,**

v.

**Donald R. WATKINS, M.D., Edward S. Konwinski, M.D. and Surgical Associates of Bradford.**

Superior Court of Pennsylvania.

Argued Aug. 23, 1989.

Filed June 20, 1990.

366

Robert Gawlas, Wilkes–Barre, for appellant.

William J. Kubiak, Bradford, for appellees.

Before CAVANAUGH, BROSKY and ROWLEY, JJ.

BROSKY, Judge.

This is an appeal from the judgment entered on a jury verdict in favor of appellees and against appellant after denial of post-trial motions.

Appellant raises the following issues on appeal: (1) whether the trial court erred in granting appellees a compulsory non-suit on appellant's breach of contract action and denied his points for charge; (2) whether the trial court erred in refusing certain points for charge regarding appellant's "freeze-out" claim in favor of its own instructions; (3) whether the trial court erred in prohibiting appellant from presenting testimony that he owned an interest in Surgical Associates and in ruling, instead, that no stock option existed; (4) whether the trial court erred in refusing to permit appellant to read certain admissions made by appellees, in permitting appellant to read only portions of certain admissions of appellees and in failing to charge the jury concerning the effect of the admissions; (5) whether the trial court erred in denying appellant's Motion in limine at trial concerning acts of misconduct occurring prior to the renewal of his employment contract and in refusing to permit appellant to read into the record various admissions; and (6) whether the trial court erred in refusing to allow appellant to present evidence and argument relative to his claim for punitive damages and whether the court incorrectly instructed the jury on this claim. We affirm.

Appellant, Benjamin C. Schecter, M.D., was employed as a surgeon in Bradford, Pennsylvania, by Surgical Associates of Bradford (Associates). The appellees are Donald R. Watkins, M.D., Edward S. Konwinski, M.D., and Associates, which terminated the employment of appellant at a meeting of the Board of Directors on August 10, 1984.[1] Appellant filed an action alleging, *inter alia*, breach of his written employment contract with appellees. At the time of his termination, Dr. Schecter was recovering from a bout with alcoholism at the Marworth Facility, which is part of the Geisinger Medical Center. At issue are two provisions of this contract, Paragraph Three and paragraph Five. These two provisions read as follows:

3. *TERM OF EMPLOYMENT.* The term of this Agreement shall be one (1) year from the date set forth unless either party shall give ninety (90) days notice of their intention to terminate the agreement prior to the end of the term. This Agreement shall otherwise terminate at any time if the Employee should cease to be authorized to practice medicine in the Commonwealth of Pennsylvania, if he should die or become permanently disabled or if the Employer and Employee should mutually so agree in writing. At any time after six (6) months from the date herein, Employer and Employee may renegotiate the term of this Agreement.

\*       \*       \*       \*       \*       \*

5. *DISABILITY.*

A. In the event of the inability of the Employee to perform his duties pursuant to this contract for a period of up to six (6) successive months due to sickness or accident his full salary shall continue to be paid by the Employer during such period. In the event such disability continues beyond six (6) months he shall be compensated to the extent that the disability income insurance shall provide. The term disability shall be defined in accordance with the definition as contained in

1. Doctors Watkins and Konwinski are officers as well as employees of Associates.

those contracts recited in paragraph C. In determining periods of disability, periods of disability shall be counted as successive if the Employee has not returned to work for at least one (1) month between such periods of disability.

B.　　　* * *

C.　　　* * *

Dr. Schecter argues that appellees' termination of his employment with Associates is in breach of Paragraph Five of the employment contract, above, because he was wrongfully terminated due to an illness, i.e., alcoholism. Dr. Schecter maintains that Paragraph Five prohibits termination on account of illness because its terms provide for continuation of salary payments during the disability period and, if necessary, the payment of disability insurance income. Appellees counter that Dr. Schecter's termination was in accordance with Paragraph Three of the contract. At the end of Dr. Schecter's presentation of evidence at trial, appellees moved for and were granted a non-suit on the breach of contract claim.[2] The rule regarding the entry of a non-suit has been oft-stated.

The entry of a non-suit is reserved for the clearest of cases. The plaintiff must be given the benefit of all the evidence and the reasonable inferences therefrom. All conflicts in evidence must be resolved in favor of the plaintiff. Viewing the evidence in this manner, if the trier could not reasonably conclude that the cause of action has been established, then a non-suit is proper. *Morena v. South Hills Health System*, 501 Pa. 634, 462 A.2d 680 (1983). Grounds exist for the entry of a non-suit if the plaintiff has failed to introduce sufficient evidence to maintain the cause of action. In that event, it becomes the duty of the court to

2. The parties, both at trial and in their respective appellate briefs and the court at trial and in its Opinion filed in support of its order denying post-trial motions, refer to the dismissal of the breach of contract claim interchangeably as a non-suit or a demurrer to the evidence. Since in modern practice the demurrer has been virtually superseded by the compulsory non-suit, the procedures are, in effect, identical. *Vernon D. Cox & Co., Inc. v. Giles*, 267 Pa.Super. 411, 406 A.2d 1107, n. 2 (1979).

determine, prior to sending the case to the jury, whether the plaintiff has met his evidentiary burden. *Id.*

The court concluded at the close of Dr. Schecter's case that the latter had not presented evidence upon which his breach of contract claim could be sustained. Our review of the trial transcript supports the trial court's ruling.

At trial, Dr. Schecter attempted to introduce and did, in fact, introduce evidence that alcoholism is an illness and, from that premise, attempted to prove that his discharge was in breach of Paragraph Five of the contract. Dr. Schecter presented evidence in the nature of testimony from health care personnel at the Marworth Center to this effect. He also presented evidence that this was the official position of the American Medical Association (AMA) and the Pennsylvania Medical Society (PMS). According to these organizations, fellow physicians had the responsibility to help each other on the road to recovery from alcoholism by encouraging the recovering alcoholic physician to once again become a productive member of the profession. Dr. Schecter attempted to demonstrate that appellees' termination of his employment with Associates was not in keeping with the position espoused by these professional organizations and, therefore, effected a breach of Paragraph Five of the employment contract.

Appellees have never contested that alcoholism is an illness. However, by the introduction of evidence to this effect, Dr. Schecter attempted to demonstrate that appellees' termination of him was because of his alcoholism and, therefore, constituted a breach of the terms of Paragraph Five of the employment contract. Dr. Schecter attempted to show that the official position of the AMA and the PMS was binding upon appellees to support his breach of contract claim. In addition, Dr. Schecter introduced evidence through the testimony of Dr. Colangelo, the president of the Marworth Center, that an individual who has lost employment because of alcoholism has a lesser chance of recovery. In short, the only evidence introduced by Dr. Schecter at trial to support his breach of contract claim was

that alcoholism is an illness, that both the AMA and the PMS recognized this to be so and that appellees disregarded this position as well as that of the health care personnel at the Marworth facility.

At trial, appellees denied that Associates had terminated Dr. Schecter because of his alcoholism. At the meeting of August 10, 1984, Associates decided to terminate Dr. Schecter. According to the minutes of that meeting, as testified to by appellee, Dr. Watkins, Associates decided to terminate Dr. Schecter's employment under Paragraph Three of the contract. The termination was to be effective ninety days after notice to Dr. Schecter pursuant to the terms of Paragraph Three of the employment contract. According to the minutes, "Doctor Schecter [would] be discharged for reason of his material failure to perform and satisfy the terms and convenants [sic] set forth in paragraphs one, two and three of said employment agreement." N.T. 62.[3] Nothing in the minutes of the meeting of Associates held on August 10, 1984, nor any other testimony adduced in the presentation of Dr. Schecter's case, specifically indicates as the reason for his termination his illness.

Dr. Schecter presented evidence at trial that Dr. Watkins, an appellee here, was previously stricken with coronary disease, was not dismissed because of this and continued to

---

**3.** The minutes of the August 10, 1984 meeting disclose some doubt as to whether the subject employment contract, which was dated July 1, 1980, was still in force at the time Associates decided to notify Dr. Schecter that he would be terminated. This is because Paragraph Three of the employment contract provided that the duration of the agreement would be for one year from July 1, 1980. Each year subsequent to July 1, 1980, Associates held a meeting on June 30, renewing the contract for another year and increasing the salaries of the physicians employed by Associates. However, no meeting was held in 1984 until August 10. Because of the possibility that the employment contract was not in effect at the time of the August 10, 1984 meeting, Associates "elect[ed] to terminate Doctor Schecter's employment relationship with the corporation effective immediately because of his failure to provide services and meet the standards expected of him and set forth in the employment agreements heretofore in effect." N.T. 62. At trial, however, all parties agreed that the employment contract had been renewed and was in effect at the time of the August 10, 1984 meeting. Even under this contingency, however, Dr. Schecter's employment was not terminated because of his illness.

receive his salary, as well. Dr. Schecter urged at trial and now urges on appeal that illness due to coronary disease is no different from illness because of alcoholism in terms of continuing his salary and employment with Associates under the terms of Paragraph Five of the agreement. Appellees counter, however, that Associates was not dissatisfied with the services of Dr. Watkins, and, consequently, that physician was not terminated.

Although Dr. Schecter relies solely on Paragraph Five of the agreement to support his claim of breach, a fair reading of this paragraph indicates that it is not a term of employment clause. This paragraph provides for contingent financial security in the event an *employed* physician of Associates is unable to work because of illness or accident. This paragraph, according to its terms, would support a breach of contract action only if Dr. Schecter had remained an employee of Associates and then only if Associates had refused to pay the salary of Dr. Schecter for the specified period during his disability or if it had not maintained a contract of disability insurance on him or if the disability insuror had refused to compensate him according to the terms of the policy.

Paragraph Three of the agreement, however, is a term of employment clause and is specifically labeled as such. This paragraph provides for a term of employment of one year from the date set forth in the agreement unless either party to the agreement gives ninety days' notice of intent to terminate prior to the end of the one-year term.[4] Unlike the employment-at-will situation, the contract here in question was an express one limiting Associates' ability to discharge its employees. An employment contract of definite duration cannot be legally terminated by an employer prior to its expiration date. *Dorn v. Stanhope Steel, Inc.,* 368 Pa.Super. 557, 534 A.2d 798, *appeal denied,* 518 Pa.

---

4. Other reasons for termination contained in Paragraph Three are lack of authority to practice medicine, death, permanent disability or a mutual agreement in writing to terminate. These conditions do not require the ninety days' notice, nor are they applicable to the case at bar.

656, 544 A.2d 1342 (1988). An employer may not terminate an employee for the duration of the contract period absent just cause. *Greene v. Oliver Realty, Inc.*, 363 Pa.Super. 534, 526 A.2d 1192 (1987). The employment contract at issue here, however, expressly permits termination at the behest of either party to the contract prior to the end of the contract period without a showing of any cause.

In his Reply Brief, Dr. Schecter, in effect, concedes this point:

If Defendants [appellees here], as they have contended from the very beginning of this litigation, could at any time terminate the employment relationship upon ninety (90) days [sic] notice, then *they needed no justification for doing so; they needed only to show that the Contract allowed them to terminate on ninety (90) days [sic] notice* and that they provided DR. SCHECTER with such notice.

At 8; emphasis supplied. Dr. Schecter does not argue that he was not given the requisite ninety-day notice of termination, nor does he argue that the terms of the employment contract were not the result of an arms' length bargained-for exchange. He admitted at trial that the language of the contract was clear and that the contract was not one of adhesion. At trial, counsel for Dr. Schecter stated the following:

MR. LEVINSON:

I object to the question as being irrelevant. The language of the contract speaks for itself. We have the document in evidence, [sic] I don't see there's any relevance concerning negotiations or terms of the contract.

N.T. 145.

MR. LEVINSON:

Counsel agrees it was a contract negotiated at arms length, [sic] it's not a contract of adhesion.

N.T. 146.

With regard to this issue, we find as follows: (1) Paragraph Five of the employment agreement is not a term of

employment clause. We have discussed the nature and purpose of this clause, above; (2) Paragraph Three of the employment agreement is a term of employment clause. As discussed above, it sets forth the duration of the term of employment and the circumstances under which the employee may terminate or may be terminated. It does not require cause for termination on the part of either the employer or the employee; (3) Dr. Schecter has not alleged or proven at trial any breach of Paragraph Three of the employment agreement. Specifically, Dr. Schecter has neither alleged nor proven that he was terminated without the requisite ninety-days' notice prior to the end of the contractual term, the only condition of termination applicable to him under the circumstances. Nor has he alleged or proven that the ninety-day termination provision is unconscionable, adhesive or was not bargained for. In short, Dr. Schecter failed to introduce any evidence at trial which the fact finder could consider as giving rise to a breach of the subject employment agreement. We therefore conclude that the grant of the non-suit with respect to this claim was proper.[5]

Dr. Schecter's next challenge is to the jury charge on his claim of "freeze-out". He contends that his points for charge on this claim were correct and that the trial court's charge was erroneous and confusing. We disagree.

It is now well-settled that in reviewing a challenge to a jury charge, an appellate court will scrutinize the entire charge against the evidence presented to determine if prejudicial error has occurred. This court will not reverse on the basis of isolated inaccuracies if the charge as a whole was not erroneous and did not prejudice the complaining

5. Dr. Schecter also makes the related argument that the trial court erroneously refused his Points for Charge relating to the breach of contract claim. The trial court stated that since it granted a non-suit to this claim, the points for charge on that issue were irrelevant. Although we agree that the points for charge were properly not given, a more accurate statement of the law is that a trial court must refuse to give a requested point which has no application to the facts or which assumes the existence of evidence not in the record. *Holland v. Zelnick*, 329 Pa.Super. 469, 478 A.2d 885 (1984).

party. *Nobel C. Quandel Co. v. Slough Flooring, Inc.*, 384 Pa.Super. 236, 558 A.2d 99 (1989). We have reviewed the charge relating to Dr. Schecter's "freeze-out" claim, in particular, as well as the entire charge, generally, according to the aforementioned standard. From this reading, we are satisfied that the charge was accurate and sufficiently covered Dr. Schecter's requested points for charge on this issue.

The term "freeze-out", also known as and referred to by the trial court as a "squeeze-out", is defined in Black's Law Dictionary as follows:

Action taken by persons in control of corporation resulting in termination of a shareholder's interest, and term implies a purpose to enforce a liquidation or sale of other stockholder's shares, not incident to some other wholesome business goal.... The use of corporate control vested in the statutory majority of shareholders from the enterprise or to reduce to relevant insignificance their voting power or claims on corporate assets. It implies a purpose to force upon the minority shareholder a change which is not incident to any other business goal of the corporation....

At 599. The trial court explained the concept of "freeze-out" to the jury as follows:

The question you must decide is whether Doctor [sic] Watkins and Konwinski acted together to use their majority power to act without legal justification to do things which were intended to and did harm the plaintiff's economic position as a shareholder. Did they in other words freeze out another owner, did they breach their duty of loyalty and fairness so that they themselves would be economically benefited.

N.T. 690. Upon request for clarification, the trial court further explained the theory of "freeze-out":

In order for the plaintiff to win you must be satisfied ... that ... the defendants used their ownership position to freeze out or force out Doctor Schecter unjustifiably and that as a result, he was economically harmed. To deter-

mine whether or not a freeze out has occurred, you have to examine the entire course of dealings between the parties. Did the defendants have good reason to do what they did. Or did they engage in a course of conduct with the intent of forcing the plaintiff out of the business and financially harming him.... If you determine that what the defendants did was motivated by an unethical or unfair or improper motive, then you may conclude that a freeze out has occurred. If however you determine that what they did was properly motivated, then a freeze out has not occurred.

*Id.*, 712–713. This charge not only comports with the legal definition of "freeze-out" but is also substantially similar to the definitional charge requested by Dr. Schecter.

Any mention of damages on Dr. Schecter's claim for breach of the employment contract which was requested in connection with the points for charge on damages for the "freeze-out" claim was properly disallowed as the former claim was not before the jury. However, the court did instruct on damages relative to the "freeze-out" claim as follows:

Now I have told you that whether or not Doctors Watkins and Knowinski and Surgical Associates of Bradford broke the employment contract is not an issue for you to decide. You may, however, take into account all of the circumstances surrounding the corporations' [sic] decision to discharge Doctor Schecter and in deciding whether or not he was frozen out.

[Y]ou must be satisfied ... that the plaintiff's [sic] used their ownership position to freeze out or force out Doctor Schecter unjustifiably and did so for their own economic benefit. If you decide that they did freeze out Doctor Schecter, then you must decide how much money, if any, they should pay Doctor Schecter to reimburse him for the loss he incurred due to their action.

At 690–91.

As part of his challenge to the jury charge, Dr. Schecter alleges that the court gave no instruction relative to the

personal liability of Doctors Watkins and Konwinski, as officers of Associates, as requested in Point for Charge number fifteen. Using the aforementioned standard of reviewing a jury charge for errors or omissions, we conclude that the charge was not derelict in this regard. Throughout the jury charge, the trial court mentioned the potential liability of both Doctors Watkins and Konwinski to Doctor Schecter.

As his final challenge to the jury instructions, Dr. Schecter claims that the trial court erroneously, inadequately and in a confusing manner instructed the jury on the method of determining the fair value of Dr. Schecter's stock in Associates. According to Dr. Schecter, this instruction permitted the jury to consider *any* factor that body deemed appropriate in determining the fair value of the stock. Dr. Schecter avers that the trial court failed to instruct the jury in the manner requested by his Point for Charge number sixteen. The charge as given by the court reads as follows:

> The law says that if he was frozen out he's entitled to be paid the fair value of his stock. What fair value is, how much money, is for you to decide. You have heard several factors which bear on this testified to and argued. They include for example book value, asset value, earnings and profit trends, absence of a covenant not to compete, the agreement of allocation of accounts receivable between Doctor Watkins and Doctor Konwinski and the market value of the shares. You may consider any such factor you think is appropriate in deciding what Doctor Schecter's twenty-five shares are worth.

*Id.*, 691–92. In *In re Watt & Shand*, 452 Pa. 287, 304 A.2d 694 (1973), our Supreme Court explained that in determining the fair value of a minority holder's stock, "consideration must be given to all factors and elements which reasonably might enter into the fixing of value." 452 Pa. at 292, 304 A.2d at 698. The court then listed some of the factors which must be considered, viz: asset value, market value and price, management and its policies, earnings, dividends, valuation of assets, reserves for contingencies, tax liabili-

ties, future earnings and projected business. We find that the court charged substantially according to the language of *Watt* which Dr. Schecter had cited as authority for his requested point. Therefore, Dr. Schecter's claim that the jury was impermissibly informed that it could consider any factor in the context of assessing fair valuation of his stock is unfounded.[6]

In his next issue, Dr. Schecter complains that he was improperly prohibited from presenting testimony and argument that he owned or was entitled to one-third of the stock of Associates. He also alleges that the court erred in concluding as a matter of law that no option existed to permit him to purchase additional stock to complete his one-third share. At trial, Dr. Schecter and Dr. Watkins both testified that Dr. Schecter, upon joining Associates, purchased twenty-five shares of the corporation. At several annual meetings of Associates, he was made an offer to purchase and asked if and when he would purchase the remaining shares, thus bringing him up to ownership parity with Doctors Watkins and Konwinski. Dr. Schecter, throughout his tenure with Associates, informed the corporation that he was financially unable to purchase the remaining shares.

At a meeting held on November 14, 1984, Associates resolved to ratify the withdrawal of its offer to Dr. Schecter to purchase any additional shares of stock. At trial, Dr. Schecter admitted that he never made demand upon Associates to exercise his option to purchase the remaining shares prior to the meeting of November 14, 1984. Dr. Schecter, despite his testimony, attempted to show that by letter of October 30, 1984, through his then counsel, Mr. Roth, he made a demand to purchase the remaining shares of stock which would then place him on parity with his colleagues at Associates. However, the court instructed the jury to disregard any indication that Dr. Schecter had made the de-

6. Dr. Schecter, as part of this issue, reiterates his argument on the breach of contract claim. This matter has been discussed elsewhere in this Opinion.

mand because of the uncertainty surrounding the representation made in the letter. The court similarly disallowed any reference to this letter as representing a demand to purchase the outstanding shares when Mr. Wick, the secretary of Associates, was examined concerning his knowledge of Dr. Schecter's demand. The purpose of representing this letter to be a demand by Dr. Schecter to purchase the outstanding stock was to demonstrate that Associates had withdrawn its offer to purchase only after Dr. Schecter had attempted to exercise that right. Based upon this testimonial background, we conclude that Dr. Schecter's complaint that the trial court prohibited him from presenting evidence that he owned or was entitled to the remaining stock is lacking in factual basis.

The trial court held as a matter of law that Dr. Schecter had no right to acquire the additional stock because it did not construe the language of Paragraph Four of the employment agreement, which addresses the purchase of stock, as an option to sell or purchase. An option contract is a contract to keep an offer open. However, the option arises and exists only if and unless the optionee elects to exercise the option by unequivocally accepting the offer. *Warner Bros. Theatres, Inc. v. Proffitt*, 329 Pa. 316, 198 A. 56 (1938). Moreover, if an option is not exercised within the time set forth in the contract, it necessarily expires. *Western Savings Fund Society v. SEPTA*, 285 Pa.Super. 187, 427 A.2d 175 (1981). Two notable commentators have stated that while "time is of the essence in an option contract ... this means only that the option cannot be exercised after the offer has lapsed." J. Calamari and J. Perillo, The Law of Contracts, at 91 (2d ed. 1977).

Based upon the foregoing principles of law, we conclude that an option to purchase the stock did exist but that its purported acceptance was, as a matter of law, at least untimely, if not equivocal. As noted above, Dr. Schecter, by his own admission, never accepted the offer to purchase during any contractual period of the employment agreement, although Associates periodically reminded him of his

right under the agreement to elect to purchase the stock. The trial court ruled that the letter of October 30, 1984, which purportedly contained a demand to purchase under the agreement was, at best, equivocal.[7]

However, an even more compelling reason exists to hold that Dr. Schecter's option to purchase the outstanding shares of Associates was not valid even if acceptance of the offer to purchase had been unequivocal. Paragraph Four of the employment agreement, which is entitled "Compensation", addresses the purchase of stock as follows: "After the first year, *should employment continue* [sic] Employee shall have the right from time to time to purchase capital common stock of the corporation, the number of shares so purchased to be mutually agreed upon by Employer and Employee." (Emphasis supplied). Associates, at a meeting held on August 10, 1984, voted to terminate Dr. Schecter's employment relationship with it. As we stated elsewhere, Dr. Schecter does not argue that he did not receive notice of this meeting or of the ultimate decision of Associates to terminate his employment relationship with it. On November 14, 1984, Associates, by written resolution, ratified the withdrawal of its offer to Dr. Schecter to purchase any additional shares of Associates.[8] As noted elsewhere, Paragraph Three of the employment agreement provides for a ninety-day notice of termination. The November 14, 1984 ratification of the withdrawal of the offer and the November 8, 1984 letter to Dr. Schecter notifying him of the said withdrawal both occurred after the ninety-day notification of termination. Thus, withdrawal of the offer was proper because Dr. Schecter at that time was no longer an employee of Associates.

Additionally, because the trial court ruled that the terms of the letter of October 30, 1984 purporting to accept the

7. Although the trial court admitted this letter as an exhibit, we have not been able to examine its contents because it does not appear of record.

8. The minutes of this meeting indicate that Dr. Schecter was actually notified of withdrawal of the offer by letter dated November 8, 1984. Dr. Schecter does not dispute this.

offer to purchase were uncertain, the option to purchase expired by operation of the terms of the contract, in any event, ninety days after Dr. Schecter was notified on August 10, 1984, that he would be terminated. *See Western Savings, supra,* and Calamari & Perillo, *supra.* Therefore, no error occurred here.[9]

Next, Dr. Schecter maintains that the trial court erred in denying his motion *in limine* to preclude evidence of his misconduct prior July 1, 1984, the date on which the renewal of his employment contract became effective through June 30, 1985. The misconduct referred to is Dr. Schecter's behavior due to the effects of alcoholism.

Dr. Schecter initially argues that evidence of his behavior prior to July 1, 1984, prejudiced him before the jury and may have influenced the jury to bring in a verdict against him. The basis for Dr. Schecter's suit against appellees was that the latter had unjustly terminated him because of his bout with alcoholism. Dr. Schecter testified at trial that he recognized that he had been an active alcoholic for thirty years prior to obtaining treatment, that he had gone to the Marworth facility for initial evaluation in 1983 and was told then that he had a problem with alcohol, that he knew in the early 1970's that he had had a drinking problem, that he had this problem when he was hired by and all through his tenure with Associates and that Doctors Konwinski and Watkins had approached him about this problem as early as 1980 or 1981. Dr. Schecter also testified concerning an incident report which was filed against him in October 1983 concerning his behavior in the emergency room at Bradford Hospital. He stated that this incident resulted in a letter of

---

**9.** Dr. Schecter also appends to this issue two inconsistent arguments, viz: that a directed verdict should have been granted on the issue that he had the option to purchase additional stock and that whether he had the option to purchase the stock was a jury question. He also raises the contention that it was error to refuse Dr. Schecter's request to read the deposition testimony of Doctors Watkins and Konwinski into the record concerning the stock option. The former two arguments have not been included as part of or suggested by the Statement of Question relating to the issue under discussion. *See* Pa.R.App.P. 2116(a). The latter will be addressed as part of another issue, *infra.*

January 4, 1984, from the hospital administrator that such behavior would not be tolerated. In short, Dr. Schecter presented the very evidence which he sought to have excluded by the Motion. Therefore, in light of his testimony, Dr. Schecter can hardly complain that the denial of the motion *in limine* was prejudicial to him.

Alternatively, Dr. Schecter contends that even if evidence of his behavior prior to July 1, 1984, were relevant, appellees waived their defense of discharge on the basis of Dr. Schecter's problem with alcohol because Associates continued to renew Dr. Schecter's employment contract each year with concomitant salary increases. However, at trial, Doctors Watkins and Konwinski denied that they had discharged Dr. Schecter because he was an alcoholic. The minutes of the meeting of August 10, 1984, introduced as evidence at trial, gave as the reason for Dr. Schecter's termination breach of Paragraphs One, Two and Three of the employment agreement. The Doctors also testified that Associates discharged Dr. Schecter in accordance with the terms of Paragraph Three of the agreement. Hence this argument is also meritless.

■ Dr. Schecter's next complaint is that the trial court erroneously refused to permit him to read into the record various admissions made by Doctors Watkins and Konwinski in their depositions. These admissions refer to the stock purchase option and the breach of contract issue. Specifically with respect to the latter, Dr. Schecter wished to read into evidence Dr. Watkins' admission that he agreed that alcoholism is an illness. We have reviewed the deposition testimony to which Dr. Schecter refers and find that it is virtually identical to the testimony given by this witness at trial. The trial court properly refused to allow these admissions to be read into the record since the evidence was merely cumulative to that already presented. We have exhaustively discussed the substance of the breach of contract and stock purchase issues elsewhere in this Opinion and will not repeat it here.

Dr. Schecter also argues that an admission of Dr. Watkins in his deposition concerning a conversation with Mrs. Schecter should have been read into evidence as being relevant to the "freeze-out" claim, the claim for punitive damages and to impeach Dr. Watkins' testimony. That deposition testimony merely refers to a conversation between Dr. Watkins and Mrs. Schecter concerning Dr. Schecter's departure for Marworth and Dr. Watkins' concern for the future well-being of Dr. Schecter and Associates. We have reviewed this deposition testimony and are unable to ascertain how it relates to the "freeze-out" claim, the claim for punitive damages or in what respect it could be used to impeach Dr. Watkins. This argument constitutes a mere recital of bald allegations to that effect.

Dr. Schecter's last allegation of trial error relates to the court's refusal to admit into evidence the AMA and PMS standards on alcoholism and alcohol-impaired physicians because admission of these standards would be relevant to an award of punitive damages on the "freeze-out" claim. Dr. Schecter alleges that punitive damages were awardable on the basis that Dr. Watkins' and Dr. Konwinski's deviation from the aforesaid AMA and PMS standards constituted outrageous conduct and reckless indifference to Dr. Schecter's rights. Dr. Schecter also maintains that the trial court erroneously instructed the jury that it could award punitive damages only if it found that Dr. Schecter was entitled to compensatory damages in excess of one thousand eight hundred eighty-two dollars and seventy-two cents, representing the amount which he paid for the initial twenty-five shares of stock of Associates. The trial court's charge does not support the interpretation suggested by Dr. Schecter. The trial court merely stated the amount which Dr. Schecter paid for the twenty-five shares of stock and then instructed the jury that it could award punitive damages if it determined that Dr. Schecter had suffered a financial loss as a result of a "freeze-out".

The purpose of punitive damages is to punish for outrageous conduct done in reckless disregard of anoth-

er's rights. The aim of punitive damages is deterrence of similar conduct. *Kirkbride v. Lisbon Contractors, Inc.,* 521 Pa. 97, 555 A.2d 800 (1989), *on remand,* 385 Pa.Super. 292, 560 A.2d 809 (1989). Punitive damages must arise out of liability on the cause of action because they are an element of damages flowing therefrom. Thus, if no actual damages are sustained, an award of punitive damages is not appropriate. *Id.* Dr. Schecter's arguments, then, are moot in light of the jury's rendition of a verdict of non-liability in favor of appellees.

Judgment affirmed.

CAVANAUGH, J., concurs in the result.