608 A.2d 496

**Allen Eugene WAGNER, an Incompetent, By
Ray Allen WAGNER, his Guardian**

v.

**YORK HOSPITAL, Appellant.**

Superior Court of Pennsylvania.

Argued March 12, 1992.

Filed April 30, 1992.

Reargument Denied June 30, 1992.

Petition for Allowance of Appeal Discontinued Oct. 13, 1992.

1

4

Perry S. Bechtle, Philadelphia, for appellant.

William A. Atlee, Jr., Lancaster, for appellee.

Before POPOVICH, HUDOCK and HESTER, JJ.

HESTER, Judge:

This is an appeal and cross-appeal from judgment entered following the jury's six and one-half million dollar award in favor of the plaintiff in this medical malpractice action. We affirm.

Ray Allen Wagner, guardian for Allen Eugene Wagner, an incompetent, instituted this medical malpractice action against York Hospital. Until we reach the issue presented in the cross appeal of Mr. Wagner, we will refer to Mr. Wagner as appellee and York Hospital as appellant or the hospital. Although the issues on appeal primarily involve damages, we will briefly review the liability evidence introduced at trial.

On Sunday, November 13, 1988, twenty-three-year-old Allen Wagner and his friend, Glenn Lauchman, met at 7:30 a.m. to get an engine from Glenn's father that Allen wanted to use to restore an old car. Allen and Glenn drove separate vehicles to the Lauchman residence. On the way, Allen lost control of the pickup truck that he was driving, and it left the road. Allen sustained a head injury in the accident and was semi-conscious when he arrived at the hospital. At that time, Allen was able to move his extremities.

Hospital physicians decided to order a CAT scan of Allen's head and administered the paralyzing drug Pavulon to prevent him from moving during the procedure. Since Allen was not able to breathe on his own once the drug was administered, he became dependent on a mechanical ventilator connected to him by a flexible tube. After the CAT scan was completed, Allen was moved to the intensive care unit of the hospital. At 11:35 a.m., a chest x-ray was taken in his room using a portable machine. Minutes after the x-ray was finished, Allen's heart rate began to slow, and the heart rate alarm sounded. A nurse reported the incident to Dr. Thomas R. Scott, who instructed her to increase Allen's IV fluids; the doctor did not examine Allen. Several min-

utes later, the heart rate alarm sounded a second time, and the nurse again telephoned Dr. Scott, who then reported to Allen's room.

Dr. Scott administered a heart stimulant, and when Allen did not respond, the doctor ordered an arterial blood gas test. That test indicated that the level of oxygen and carbon dioxide in the patient's blood was low. When the nurse withdrew some of Allen's blood, it was dark in color, which indicated that it was not oxygenated properly. Dr. Scott then checked the patient's airway and discovered that the ventilator tube was disconnected. Based on the blood tests performed at that time, one of appellee's expert witnesses, Dr. Jonathan Gottlieb, testified that Allen had been disconnected from his oxygen supply for fifteen to twenty-five minutes. This time frame corresponds to the time that the x-ray, a procedure requiring Allen to be moved, was taken.

Hospital personnel examined the ventilator machine to determine why the ventilator's disconnect alarms had not sounded when the unit was disconnected. They discovered that the controls that activate the disconnect alarm had not been properly turned to the "on" position. The responsibility for setting the control is with the Department of Respiratory Therapy at York Hospital and was assigned to a specific respiratory therapist on the day in question. At trial, that therapist acknowledged that she had not activated Allen's alarm. Two expert witnesses for appellee testified that standard medical care required the therapist to be certain she had properly adjusted the disconnect alarms before leaving Allen on the ventilator in the intensive care unit. The hospital did not present contrary expert testimony but argued that the therapist's actions were reasonable because when she left Allen in the intensive care unit, Dr. Scott and a nurse were in his room.

Allen is now in a persistent vegetative state. The results of the CAT scan performed on Allen when he initially entered the hospital showed that Allen had sustained a fracture of the skull, but there was no significant hemor-

rhaging. Dr. Robert Zimmerman, a neuroradiologist from New York Hospital, testified that subsequent CAT scans established that Allen's present condition is the result of destruction of basal ganglia in the brain caused by oxygen deprivation.

Dr. Lawrence Marshall also testified as an expert witness for appellee. He has extensive credentials on the subject of prognosis for recovery of head injury patients and has done extensive research on the effect of oxygen deprivation in patients suffering from head trauma. Dr. Marshall examined the initial CAT scan performed when Allen arrived at the hospital. In his professional opinion, it was an "overwhelming probability" that Allen would have recovered from the traffic accident and become a "productive member of society." Reproduced Record ("R.R.") at 206a. He also stated that the likelihood that the head injury alone would have caused Allen's present, vegetative condition was "zero." *Id.*

Following the jury's award of six and one-half million dollars, appellee filed a request for delay damages, and the parties filed post-trial motions. This appeal followed the imposition of delay damages and the denial of post-trial motions.

We will examine appellant's first two arguments together, as they are interrelated. Appellant contends that the trial court erred in permitting the jury to view a "day in the life" film of Allen Wagner. It also argues that the trial court erred in instructing the jury that it could award him compensation for pain and suffering as well as for the loss of enjoyment of life. These two arguments are predicated upon its position that since Allen is in a persistent vegetative state, he is totally and completely unaware of his environment and cannot feel pain or suffering or experience loss. It posits that the day in the life film was not an accurate representation of his life since it gave the jury the mistaken impression that Allen is cognizant of his pitiful condition.

Appellant suggests that an individual in a persistent vegetative state may "appear" to feel pain and respond to stimuli, as the film shows, but that those responses are "simply reflexive responses." Appellant's brief at 20. It argues that Allen is totally oblivious to his surroundings and is incapable of feeling pain. Thus, appellant continues, the film that shows Allen making responses to stimuli also was misleading. Based on the same factual premise, appellant contends that the jury was incorrectly instructed that Allen is entitled to compensation for pain and suffering and loss of life's pleasures.

We disagree with the factual premise of appellant's argument, *viz.*, that the evidence *conclusively* establishes that Allen does not feel any pain and is both totally unaware and unable to respond to his environment. We also disagree with the legal premise that someone who may not have cognizance of a loss due to a diminished state cause by defendant's negligence is thereby precluded from recovering damages for the loss caused by defendant.

Appellant makes the following, specific objections to the film:

> For example, the film begins with Mr. Wagner's daily routine. A caregiver removes the braces from his legs saying, "I'm going to take your brace off, give me your leg ... that's good," as if Mr. Wagner responded to the request. She then rolls Mr. Wagner onto his side stating, "My hands are cold, huh? That's what's waking you," suggesting that Mr. Wagner can feel the cold. During another portion when Mr. Wagner is receiving physical therapy, the therapist says, "You let me know if it hurts," suggesting that he can feel pain. Also, while performing therapy on Mr. Wagner's arms, the therapist says, "Okay ... I get the message," as if Mr. Wagner had communicated something to her.

> Later in the film, Mr. Wagner's caregivers say "Allen straighten your arm out, we want to take your blood pressure." They then thank him as if he consciously responded. Later, while Mr. Wagner is being washed, a

caregiver suggests that one of his reflexive response movements was done to assist in the washing. Similarly, while the dressings on his tracheotomy tube are being removed and some guttural sounds are audible, and a caregiver says, "Right" and "Alright, it's out ... no more cold," as if Mr. Wagner was complaining about the cold.

Portions of the film involving Mr. Wagner's parents are equally misleading. At one point, Mr. Wagner's father says, "Look at me Allen. Come on look at me ... come on turn your head over this way ... you can turn it further than this," suggesting that Mr. Wagner's head movements are purposeful. Finally, Mrs. Wagner says, "Can you smile for mommy? Come on, you can do it ... I knew you could," once again, implying a cognitive response.

The Hospital does not contend that this film was staged or that it was intended to inflame the jury. The Hospital also does not dispute that it accurately shows Mr. Wagner's daily routine. This issue centers on the verbal responses to Mr. Wagner's reflexes, which inappropriately suggest that Mr. Wagner is feeling pain and consciously responding to stimuli. In short, the film misleadingly suggests conditions which simply do not exist.

Appellant's brief at 21–22 (footnote omitted).

Thus, in the film, when Allen is asked to give the therapist his leg, he performs the requested task. When Allen's mother asked him to look at her and smile, Allen does. When he is asked to move his leg, Allen responds. We, however, question whether the facts irrefutably established Allen's *total* unawareness of his environment. There was evidence supporting the position that Allen has at least some awareness of, and is able to respond to his environment.

For example, appellant's witnesses testified that Allen attempted to remove his endotracheal tube for a number of days after the disconnect incident. Allen's mother testified that her son reacts to pain by making a grimace and that when blood is drawn from Allen, he flinches. She also

testified, consistent with the actions depicted in the film, that when Allen is asked to put his leg down to assist with medical devices, he will move his leg in the manner requested. She also said that when Allen is looking one way and is asked to turn his head, he will perform that task. Allen also smiles when he sees his mother.

Similarly, Linda Foster, one of Allen's therapists, testified that he dislikes therapy and displays his displeasure by sticking out his tongue. Ms. Foster noted that Allen's face registers anger, and she feels that "[h]e was aware, too— occasionally, I would drop something with a loud bang and he would jump, he would react." R.R. at 221a.

Arlene Sloane, a registered nurse, testified for appellee as an expert in the area of rehabilitation. She stated that Allen would benefit from exposure to different environments, especially the outdoors. If Allen were totally unaware of his environment, exposure to different environments could not be beneficial. Indeed, on cross-examination, she was questioned about her opinion on this issue, and the following exchange occurred:

Q. Well, Mrs. Sloane, you are a nurse, and you've had a lot of training that you've told us about. And you know in a persistent vegetative state there is absolutely no awareness of the surroundings, of the people or the environment of Allen Wagner and people in his unfortunate status. You know that, don't you?

A. I don't believe that anybody can say that.

Q. Just answer my question.

[Plaintiff's counsel]: She is answering your question....

A. No I don't.

Q. You don't know that?

A. *There are different levels of people in that state. There are people who have a little bit more awareness than others, and there is no—we don't know. I believe that Allen does respond. He opens his eyes if his mother talks to him or things like that.*

R.R. at 269a–271a. Mrs. Sloane also stated that she had read several studies which indicate that people in a persistent vegetative state like Allen's do respond to certain people at certain times.

Appellant argues that the *expert* medical testimony was uncontroverted and conclusively established that all the noted reactions are only reflexive and that Allen is incapable of feeling pain or responding to stimuli. We disagree. The quoted portion of Mrs. Sloane's testimony refutes this suggestion. Furthermore, in making this assertion, appellant relies solely upon four pages of the testimony of Dr. Richard Herman, who was one of appellee's expert witnesses.

In that portion of the transcript, Dr. Herman was describing a persistent vegetative state in general terms. He noted that patients in a persistent vegetative state are not brain-dead, as they have brain stem functioning. R.R. at 95–96a. Dr. Herman also noted that some patients can have a certain level of awareness:

Q. The patient who is in a persistent vegetative state, Doctor, are there ranges of responses of patients within that group?

A. Oh, yes.

Q. So every patient who has this medical label placed on them is not identical to every other patient who has that—

A. That's true. Well, there is a window of responses and reflexes and so but basically, they are reflexive, their eyes are open or can be opened. And basically, they are not aware. They are sort of awake, but not aware. But they can have all kinds of modifications and reflexes.

R.R. 95a–96a.

Thus, he said that they are *basically* unaware but that there are different levels of awareness and responses. The doctor continued, "[T]hey can react to information and there are comments, albeit anecdotal, over the years and it has been summarized recently in a book by Sandel that sensory deprivation is a key issue in survival." R.R. at 96a–97a.

12

Most significantly, Dr. Herman noted that Allen fixates on objects, while a classic persistent vegetative patient will not.

Thus, the evidence does not irrefutably establish that Allen has absolutely no awareness of his surroundings. No one can know positively what Allen perceives. We also do not view as relevant cases which discuss persistent vegetative patients in the context of a patient's right to refuse further medical treatment and to terminate their lives. Allen's right to die is not being addressed in this case.

■ Furthermore, it is fundamental that a plaintiff is to be compensated fully for all loss sustained as a result of the tortfeasor's negligence. As legal support for its position on these two issues, appellant relies upon case law providing that the estate of a person who dies instantly is not entitled to an award for pain and suffering because the decedent did not suffer. However, Allen Wagner is not dead. Instead, he is lying in a bed smiling when he sees his mother and grimacing when he undergoes physical therapy. He has suffered unspeakable loss because appellant failed to turn on an alarm. He should be compensated for that loss— regardless whether he can verbalize his awareness of it to others. As the film aided the jury in determining damages, it was admitted properly at trial. Since Allen suffers pain and has suffered and will suffer loss of enjoyment of life, the jury properly was instructed to consider an award of damages for pain and suffering and loss of life's pleasures.

■ Appellant next raises two attacks on the jury instructions relating to loss of life's pleasures. Appellant contends first that the trial court violated our Supreme Court's holding in *Willinger v. Mercy Catholic Medical Center*, 482 Pa. 441, 393 A.2d 1188 (1978), when it charged the jury that Allen was entitled to loss of life's pleasures. It also posits that the trial court's instruction was in error because it told the jury to award for loss of life's pleasures as a distinct element of damages rather than as a component of pain and suffering.

Immediately following the trial court's discussion of pain and suffering, the court told the jury that Allen is "also entitled to be fairly and adequately compensated for past, present and future loss of his ability to enjoy any of the pleasures of life as a result of defendant's negligence." R.R. at 532a–533a.

It is settled that

when reviewing a party's challenge to a jury instruction, an appellate court will scrutinize the entire instruction against the evidence presented to determine if prejudicial error has occurred. *Schecter v. Watkins,* 395 Pa.Super. 363, 374, 577 A.2d 585, 591 (1990). . . .

. . . .

We will not reverse a trial court's instruction on the basis of isolated inaccuracies, but will only reverse if the charge as a whole was erroneous and prejudiced the complaining party. *Schecter [v. Watkins], supra,* 395 Pa.Superior Ct. at 374, 577 A.2d at 591. . . . "A new trial will be granted where a charge is erroneous in a basic respect and it is impossible to determine the extent to which it was prejudicial." 62 Pa.Stand.Pract.2d § 48.

*Linde Enterprises, Inc. v. Westmoreland Engineering Co.,* 412 Pa.Super. 67, 72, 602 A.2d 897, 899 (1992).

Initially, we note that in the present case, other than with respect to inclusion of the word "also," the instruction is identical to Pennsylvania Suggested Standard Civil Jury Instruction 6.01I. As to *Willinger,* we conclude that it is not applicable because in that case, the patient died. The *Willinger* court held that after a person has died, loss of life's pleasures is not an element of damages. It is undisputed here that Allen is alive and has suffered loss of life's pleasures.

In addition, the charge does not give the impression that loss of life's pleasures is a separate element of damages rather than a component of pain and suffering. The trial court merely used the word "also" as a transitional word to introduce the new concept being presented to the jury. The term did not give the jury the impression that loss of life's

pleasures was a distinct element of damages. As the charge fairly and accurately apprised the jury of the relevant concepts, a new trial is not warranted.

Appellant also argues that the trial court erroneously charged the jury that it could determine Allen's life expectancy and could award anticipated medical expenses and lost future wages accordingly. The hospital contends that since the evidence fails to support any inference that Allen will live longer than twenty years, the jury should have been instructed that the maximum period for which it could award lost wages and future medical expenses was twenty years.

As to this issue, Dr. Herman testified that considering all the circumstances of the case, Allen could live "a decade, or two or more." R.R. at 105a. He also stated that given the level of care that he was receiving, Allen could live for a "prolonged" period. *Id.* at 104a. In rebuttal, one of appellant's expert witnesses, Dr. Alan VanSant, opined that Allen would live five years. However, another of appellant's experts, Dr. Warren Wasiewski, admitted that a position paper upon which he relied in his direct testimony states that "patients in a persistent vegetative state may continue to survive for a long period of time, prolonged survival, as long as the artificial provision of nutrition and fluids is continued," and Dr. Wasiewski acknowledged that such patients are not "terminally ill." R.R. at 191a. Another medical journal relied upon by Dr. Wasiewski for purposes of his direct testimony states that patients like Allen can survive indefinitely with proper care.

It is axiomatic that where the plaintiff's evidence, even though contradicted by defense evidence, supports a given charge, the jury must be charged on the concept supported by the plaintiff's evidence, and the jury's function is then to determine which evidence to credit. *Brill v. Systems Resources, Inc.*, 405 Pa.Super. 603, 592 A.2d 1377 (1991). In the present case, there was evidence that Allen could live in excess of twenty years. The trial court instructed the jury to determine Allen's life expectancy based

on the evidence, which the court reviewed extensively. R.R. at 523a–524a. There was no error.

The next issue relates to whether the jury should have been allowed to determine whether the hospital should be required to pay for at-home treatment for Allen. On this issue, the hospital presented the testimony of Dr. VanSant, who opined that Allen should be institutionalized. Institutionalization costs less than at-home care. The Wagners, however, wish to bring Allen home and care for him there. Based on the testimony of Dr. VanSant, appellee posits that Allen must "mitigate" his damages by living the rest of his life in an institution rather than at home. However, it is clear that appellee's evidence supported the Wagners' position that Allen's needs will be served better with home care. This evidence included the opinion of a rehabilitative expert, who testified that home care is highly beneficial to persistent vegetative patients.

Also, Dr. Herman testified that it is in the patient's best interest to be at home, if possible. He stated that in a home environment, the patient has less exposure to infection, which vastly increases life expectancy. Since the hospital was arguing that appropriate personnel would not be available to Allen due to the location of the Wagners' home, appellee presented two estimates of what it would cost to care for Allen at home. One estimate called for the use of registered and licensed practical nurses, and a second allowed for the use of personal care assistants. The jury was instructed to determine the appropriate measure of future medical expenses based on all the evidence presented. This was proper. The jury could have found that institutional care was the more appropriate measure of damages; it was within its province to do so.

Relying upon *Phoenix Mutual Life Insurance Co. v. Radcliffe on the Delaware, Inc.*, 439 Pa. 159, 266 A.2d 698 (1970), and *In re Thirty West Broad Corp.*, 425 Pa. 36, 227 A.2d 827 (1967), appellant next argues that the trial court erred in allowing certain exhibits, which had been admitted into evidence, to be sent out with the jury for use during

deliberations. These cases do not support appellant's position. In *Phoenix*, our Supreme Court ruled that it was proper for the trial court to permit papers which set forth plaintiff's calculation of damages to go out with the jury even though the papers had not been introduced into evidence. The Court approved the procedure because the trial court instructed the jury that the papers were not evidence.

In *Thirty West*, the evidence that the trial court permitted to go out with the jury was determined to have been admitted improperly, and our Supreme Court thus held that the jury should not have considered, during deliberations, evidence which was improper. Neither case stands for the proposition that properly introduced exhibits may not be sent out with the jury. Instead, the case law provides that the trial court has the discretion to determine which exhibits should be permitted to go out with the jury. *Mineo v. Tancini*, 349 Pa.Super. 115, 502 A.2d 1300 (1986).

Appellant makes a secondary argument on this issue. It contends that it was error for the exhibits to go out with the jury without a limiting instruction that the exhibits were not conclusive evidence of appellee's damages. However, appellant has waived this claim because it failed to request this cautionary instruction when the exhibits went out with the jury. *Id.*

Appellant next argues that it is entitled to a new trial due to the jury's exposure to publicity. Specifically, it notes that the local newspapers carried articles which indicated that appellee had made a nine million dollar demand. The hospital observes that the jury is not permitted to be told of specific damages requested by the plaintiff. Relying upon *Carter v. United States Steel Corp.*, 390 Pa.Super. 265, 568 A.2d 646 (1990), petition for allowance of appeal granted, 525 Pa. 630, 578 A.2d 925 (1990), the hospital suggests that this publicity entitles it to a new trial. In *Carter*, the jury was exposed to improper evidence during the course of trial through information contained in newspaper articles. Some of the jurors admitted that they read

those articles and based their verdict upon them. A new trial was awarded.

In the present case, in contrast, there is no indication that the jury was exposed to the information concerning appellee's demand. During *voir dire*, appellant insured that potential jurors had not had any previous exposure to the case through newspaper coverage. Immediately after the jury was impaneled, the trial court carefully instructed the jurors to avoid any accounts of the trial that were likely to appear in the newspaper. This admonishment was repeated on several occasions during the course of the trial. There is no evidence that any juror disobeyed the trial court's admonition concerning newspaper accounts of the trial.

Finally, the precise issue now raised by appellant was not raised at trial. At trial, appellant moved for a mistrial based upon its belief that the information concerning appellee's nine million dollar settlement demand had been provided to the media by appellee's *counsel*. After a brief hearing in chambers with the newspaper reporters, the trial court ascertained that the source of the information was the court's own pretrial order. The court, therefore, denied appellant's motion for a mistrial, but it permitted the hospital to renew its motion. No subsequent motion was made.

Appellant's final complaint concerns the amount of the verdict. "In reviewing a motion for a new trial on the ground that the verdict was excessive, the standard for its grant or denial is within the discretion of the trial court and we will not interfere absent a clear abuse of discretion.... A verdict is not considered excessive unless it is 'so grossly excessive as to shock our sense of justice.'" *Gross v. Johns–Manville Corp.*, 410 Pa.Super. 486, 497, 600 A.2d 558, 564 (1991) (citations omitted). The factors to be considered, together with the particular circumstances of the case, in determining whether a verdict is excessive are:

(1) the severity of the injury, (2) whether plaintiff's injury is manifested by objective physical evidence instead of merely the subjective testimony of the plaintiff, (3) whether the injury will affect the plaintiff permanently,

(4) whether the plaintiff can continue with his employment, (5) the size of plaintiff's out-of-pocket expenses, and (6) the amount plaintiff demanded in the original complaint.

*Id.* 410 Pa.Super. at 497 n. 8, 600 A.2d at 564 n. 8.

In the present case, Allen's injuries are extremely tragic. They are manifested by objective physical evidence, and they are permanent. Allen cannot continue employment, and his medical expenses have been and will continue to be astronomical. Appellee's original demand was almost one-third again the amount of the award. Future medical expenses of $200,000 per year with a twenty year life expectancy alone is approximately four million dollars. Applying the various factors, and in light of the circumstances of this case, we affirm the trial court's determination that "the clear negligence and catastrophic injuries ... justify the verdict." Trial court opinion at 17–18. The verdict does not shock our sense of justice.

■■■ We now consider the issue raised in Mr. Wagner's cross-appeal. The trial court did not allow the jury to consider past and future medical expenses that were and are to be paid by the Catastrophic Loss Fund created under a repealed subchapter of the Motor Vehicle Financial Responsibility Law ("MVFRL"), 75 Pa.C.S. §§ 1701, *et seq.* It did so based on former section 1766(e), which provided:

> *In any action* for damages against a tortfeasor *arising out of the ownership, maintenance or use of a motor vehicle,* a person who is eligible to receive catastrophic loss benefits shall be precluded from pleading, or introducing into evidence the amount of medical and rehabilitative expenses for which such benefits were paid or are payable. This preclusion applies only to catastrophic loss benefits.

Act of February 12, 1984, P.L. 26, No. 11, § 3, as amended Act of February 12, 1984, P.L. 53, No. 12, § 3.

Identical language appeared in another preclusionary provision of the MVFRL, section 1722. That section related to

a person who had received first party medical benefits up to $10,000 and provided, *"In any action* for damages against a tortfeasor *arising out of the ownership, maintenance or use of a motor vehicle,"* a person who will or had received first party medical benefits under the minimum of required coverage of $10,000 in section 1711 of the MVFRL was "precluded from pleading, or introducing into evidence the amount of medical and rehabilitative expenses for which such benefits were paid or are payable." Act of February 12, 1984, P.L. 26, No. 11, § 3, as amended Act of February 12, 1984, P.L. 53, No. 12, § 3 (emphasis added).

This preclusionary language tracked the coverage language under sections 1711 of the MVFRL, which provided first party benefit coverage for injuries arising out of the "ownership, maintenance or use of a motor vehicle." Act of February 12, 1984, P.L. 26, No. 11, § 3, as amended Act of February 12, 1984, P.L. 53, No. 12, § 3.

The issue presented herein is whether the interpretation of the language "arising out of the ownership, maintenance or use of a motor vehicle" as used in sections 1722 and 1766(e) should be given the identical interpretation as it has been given for purposes of section 1711. If so, then the trial court correctly determined that appellant was not permitted to recover for any expenses that have been or will be paid by the CAT fund in this action against the hospital, even though the action was premised upon the hospital's malpractice and not the traffic accident.

Initially, we review the cases interpreting the relevant language. In *Schweitzer v. Aetna Life and Casualty Co.,* 306 Pa.Super. 300, 452 A.2d 735 (1982), we held that under the Pennsylvania No-fault Motor Vehicle Insurance Act, the predecessor to the MVFRL, basic loss insurance coverage is to be extended to any injuries that are causally connected to the operation, use, or maintenance of the insured vehicle. We determined that the causal connection does not have to be one of proximate cause and that a "but for" relationship is sufficient to satisfy the test. We held as long as there is "some connection" between the operation, use, or mainte-

nance of the insured vehicle and the injuries incurred, basic loss coverage should be provided. *Id.*, 306 Pa.Superior Ct. at 303, 452 A.2d at 737.

We applied the "but for" standard of causation in *Varner v. Nationwide Mutual Insurance Co.*, 340 Pa.Super. 211, 489 A.2d 918 (1985), where we specifically found that injuries resulting from medical malpractice committed during the course of treating injuries from a motor vehicle accident arose out of the use of a motor vehicle. The plaintiff in *Varner* suffered a fractured skull and left shoulder injury in an automobile accident. He subsequently suffered complications due to medical malpractice, and he sought coverage for his additional loss from his no-fault carrier. We held that the medical malpractice injuries arose out of the use of a motor vehicle since the medical treatment occurred during treatment of injuries directly and immediately received in the accident. *See also McKelvey v. Prudential Property and Casualty Insurance Co.*, 392 Pa.Super. 216, 572 A.2d 769 (1990) (applying the "but for" standard from no-fault act cases to the MVFRL).

Thus, if we conclude that the definition of "arising out of the ownership, maintenance or use" of a vehicle has the same meaning under former section 1766(e) as under former section 1711, then pursuant to *Varner*, the trial court was correct in refusing to allow the jury to consider any medical bills covered by the CAT fund. We conclude that it should. "Arising out of the use or maintenance of a motor vehicle" should have the same meaning whether one is an injured party seeking CAT fund benefits or a defendant in a tort action requesting a court to preclude the recovery of such benefits received from the CAT fund. The language in sections 1766(e) and 1711 is identical, and section 1766(e) obviously is intended to prevent recovery for bills covered by the fund.

In a treatise published by the Trial Advocacy Foundation of the Pennsylvania Trial Lawyers Association, several leading lawyers concur in this analysis. Although the treatise discusses the relationship between sections 1711 and 1722,

since section 1766(e) contained identical language to section 1722, the same rationale applies to section 1766(e):

The definition of "maintenance or use of a motor vehicle" is broad. The same definition should be applied to the preclusion section. Thus, if the victim of a motor vehicle accident caused by a manufacturer's defect can recover first party benefits, then the tortfeasor need not be the operator of a motor vehicle for the preclusion to apply. If injury is caused by a defective tire that blows out while the plaintiff is using the motor vehicle, the manufacturer could claim the benefit of the preclusion.

. . . .

On coverage issues, Pennsylvania law would require an interpretation giving the broadest meaning to the phrase. In order to assure consistency, the same broad definition should be applied in determining which tortfeasors have the benefit of the preclusion. Therefore, in many instances, the manufacturer of the defective product, *a medically negligent physician,* or other defendant not intimately connected with the actual operation of the vehicle would have the benefit of the preclusion.

*See* J. Ronco, L. Sloane & J. Mundy, *Pennsylvania Motor Vehicle Insurance: An Analysis of the Financial Responsibility Law* 15:3(a), at p. 185–86 (emphasis added).

Accordingly, we agree with the trial court that a CAT fund recipient may not plead or introduce into evidence the amount of medical expenses which were paid by the CAT fund, regardless of the nature of the claim or identity of the tortfeasor.

Judgment affirmed.