433 A.2d 1357

**Frank W. KLINGNER and Ellen Klingner**

v.

**POCONO INTERNATIONAL RACEWAY, INC.,**

**First Pennsylvania Bank N.A.**

**Appeal of FIRST PENNSYLVANIA BANK, N.A.**

Superior Court of Pennsylvania.

Argued March 21, 1980.

Filed June 19, 1981.

Reargument Denied Sept. 11, 1981.

Petition for Allowance of Appeal Denied Dec. 21, 1981.

Norman R. Bradley, Philadelphia, for appellant.

Maxwell H. Cohen and John A. Hiscott, Stroudsburg, for Klingner, appellees.

Ralph A. Matergia, Stroudsburg, for Pocono, did not file a brief on behalf of appellee.

Before CERCONE, President Judge, and PRICE, SPAETH, HESTER, CAVANAUGH, WICKERSHAM and HOFFMAN, JJ.

WICKERSHAM, Judge:

The theoretical propriety of an Article Nine security interest in ticket proceeds is a question of first impression in this Commonwealth, and has received little judicial attention anywhere. Despite the scarcity of cases on the subject, the issue is of major importance to the financing of businesses in the Commonwealth which derive revenues from ticket sales, including theatres, stadiums, concert halls, museums, racetracks, ticket agencies, and possibly airlines and transportation companies.

This appeal seeks resolution of the competing claims of First Pennsylvania Bank N.A. (the Bank), Ellen Klingner (Klingner) and Pocono International Raceway, Inc. (Pocono).

On April 28, 1972, the Bank made a $5,000,000 loan to Pocono and took an Article Nine security interest under the Uniform Commercial Code.[1] The 1972 Term Loan Agreement generated a security agreement and financing statements which were amended by an April 9, 1976 First Amendment to the Term Loan Agreement.[2]

---

**1.** Uniform Commercial Code—Secured Transactions, Act of April 6, 1953, P.L. 3, § 9–101 *et seq.* eff. July 1, 1954. Reenacted October 2, 1959, P.L. 1023, § 9, eff. January 1, 1960, 12A P.S. § 9–101 *et seq.*, Repealed November 1, 1979, P.L. 255, No. 86, eff. January 1, 1980 and transferred to Title 13 Pa.C.S. (1980 Pamphlet).

**2.** Paragraph 2 of the Security Agreement reads as follows:
"To secure the Obligations, borrower [Pocono] hereby grants or confirms to Bank as the case may be, security interests in all of Borrower's personal property and fixtures covered by Article 9 of the Code (the "Collateral"). Without limiting the generality of the foregoing, Bank's security interests shall extend to all of Borrower's:
(a) Inventory and accessions thereto whether now owned or hereafter acquired;
(b) equipment and accessions thereto, whether now owned or hereafter acquired;
(c) fixtures, whether now owned or hereafter acquired;
(d) accounts receivable and contract rights, whether now or hereafter in existence;
(e) general intangibles, whether now or hereafter in existence;
(f) chattel paper, documents, instruments, deposit accounts and money, whether now or hereafter in existence, and
(g) proceeds and products of the foregoing."

Frank and Ellen Klingner were holders of a $50,000 Pocono judgment note due October 26, 1971. Frank died May 27, 1977, and, Ellen caused the judgment, augmented by accrued interest to an amount in excess of $70,000, to be revived by writ on June 6, 1978 and caused execution process to be issued thereon on July 25, 1978.

At that time Pocono was operating an auto raceway known as Pocono International Raceway (Raceway) and the sheriff levied and took custody of $76,049.50 in ticket proceeds from the "Coca-Cola 500." The Bank thereupon filed a petition seeking to intervene and to have the Klingner levy set aside on the ground that the Bank was a secured and superior creditor whose security interest had priority over the Klingner levy as to the seized proceeds.[3]

Judge Marsh denied the motions to set aside the sheriff's levy of July 30, 1978, and the Bank brought this appeal.[4] We reverse.

**3.** The Bank was permitted to intervene. The matter then came before President Judge James R. Marsh of Monroe County at hearings held September 11, 14 and 15, 1978 on a Rule to Show Cause why the levy, supposedly executed on Sunday, July 30, 1978, should not be set aside pursuant to Pa.R.C.P. No. 3121(d)(1) and (3).

**4.** The Bank states the questions involved on this appeal as follows:
  Whether proceeds from the sale of admission tickets to a sporting or entertainment event (automobile racing) are capable of being subject to a security interest, however phrased, under Article Nine of the Uniform Commercial Code.
  Where a security agreement for a bank loan to an automobile raceway grants the bank security interests in all of the borrower's personal property and fixtures covered by Article 9 of the Uniform Commercial Code, including without limiting that generality all of the borrower's inventory (and accessions thereto), accounts receivable, contract rights and general intangibles, whether at that time in existence or thereafter acquired, and the proceeds therefrom; where financing statements duly filed of record with the prothonotary of the raceway's county and with the Secretary of the Commonwealth recite the foregoing and other items referred to in the security agreement; and where the bank's officers were present on racing days, collected all proceeds from ticket sales, and placed them in a safe labeled with the bank's name; was the bank's security interest in the proceeds of ticket sales sufficiently perfected to make its interest senior to the rights of a judgment creditor under a writ of execution issued after such filings?

In its opinion, the lower court noted that Pocono was indebted to the Bank in a principal amount in excess of $5,000,000 secured by a mortgage for $5,000,000 on Pocono's real estate located on Route 115, Long Pond, Monroe County, Pennsylvania; and further that the indebtedness was also secured by security interests in all Pocono's personal property as evidenced by several financing statements filed in the office of the Prothonotary of Monroe County, particularly by one financing statement filed June 9, 1976.

The levy had proceeded in the following manner. On Saturday afternoon, July 29, 1978, Sheriff Sebring appeared at Pocono's office in Long Pond and met with Pocono's President and Comptroller. Dr. Joseph Mattioli, the President, advised the Sheriff that he would accept service of the Writ and would himself collect and set aside gate receipts of $76,049.50 and would deliver the fund to the Sheriff. During Friday, Saturday and Sunday, July 28, 29 and 30, 1978, the sale of tickets produced funds which were commingled and placed in Pocono's safe. At 11:00 a. m. Sunday, July 30, 1978, Sheriff Sebring arrived at the Pocono offices and received currency in the amount of $76,049.50 and gave his receipt therefor.

We hold that these proceeds from the sale of admissions to the Raceway were proceeds of secured collateral under the April 9, 1976 Security Agreement between the Bank and Pocono.

## DISCUSSION

Under Pennsylvania law at the time that the levy occurred, a perfected secured creditor had unquestionable priority to the secured collateral over any judgment creditors who executed after perfection of his security interest. Uniform Commercial Code, 12A P.S. § 9–301(1)(b). A perfected interest covering "after-acquired" property attached to that property instantly when the debtor acquired rights in that property, § 9–204(1)(3); and the secured creditor continued to have a superior interest in that property over intervening judgment creditors who attempted execution after his origi-

nal UCC filing. *See* § 9–204 (Comment 2); Gilmore, *Security Interests in Personal Property* (1965) at 936–37; *Texas Oil & Gas Corp. v. United States*, 466 F.2d 1040, 1048 (5th Cir. 1972), *cert. denied*, 410 U.S. 929, 93 S.Ct. 1367, 35 L.Ed.2d 591 (1973). A prior perfected interest continued its relative priority in the "identifiable proceeds" (such as "money, checks or the like") from the sale of any of the secured collateral. § 9–306(1), (2).

There is also no doubt that the $76,049.50 in issue is "identifiable proceeds" from the sale of admission tickets to the raceway. If the ticket proceeds derived from collateral which was subject to Article Nine and was properly covered in that Security Agreement, the Bank's right to the money is unquestionable, AND WE SO HOLD.

## PHILOSOPHY BEHIND ARTICLE NINE

The philosophy behind the enactment of Article Nine is stated in the Official Comment to Section 9–101:

> The growing complexity of financing transactions forces us to keep piling new statutory provisions on top of our inadequate and already sufficiently complicated nineteenth-century structure of security law. The results of this continuing development are, and will be, increasing costs to both parties and increasing uncertainty as to their rights and the rights of third parties dealing with them.
>
> The aim of this Article is to provide a simple and unified structure within which the immense variety of present-day secured financing transactions can go forward with less cost and with greater certainty.
>
> Under this Article the traditional distinctions among security devices, based largely on form, are not retained; *the Article applies to all transactions intended to create security interests in personal property* and fixtures. . . .
>
> [Emphasis supplied.]

The Code is meant to be comprehensive and flexible, and to free the law from artificial distinctions restricting the rational conduct of commercial financing. The existence of subdivisions of personal property in the Code should not

obscure the fact that under Section 9–102, an Article Nine security interest could be taken in "*any* personal property" which was not *specifically excluded* by Section 9–103 or Section 9–104.[5] Professor Gilmore, a principal architect of Article Nine, has suggested that the "excessively complicated classification" of different types of personal property in the Article was "a sort of hangover from the first stage in drafting of Article Nine, which contemplated a series of separate statutes dealing with different types of property." Gilmore, *Security Interests in Personal Property* (1965) at 367.

## TICKETS ARE PERSONAL PROPERTY

Common sense compels our holding that tickets and the rights they evidence are "property"—they are subject to ownership, identifiable, and readily transferable from person to person.

"Personal" property as a subclass of property has been defined as "everything that is the subject of ownership, not

**5.** § 9–102 provides:

(1) Except as otherwise provided in Section 9–103 on multiple state transactions and in Section 9–104 on excluded transactions, this Article applies so far as concerns any personal property and fixtures within the jurisdiction of this State
(a) to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper, accounts or contract rights; and also
(b) to any sale of accounts, contract rights or chattel paper.

(2) This Article applies to security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract and lease or consignment intended as security. This Article does not apply to statutory liens except as provided in Section 9–310.

(3) The application of this Article to a security interest in a secured obligation is not affected by the fact that the obligation is itself secured by a transaction or interest to which this Article does not apply.

§ 9–104(j) provides:

This Article does not apply
(j) except to the extent that provision is made for fixtures in Section 9–313, to the creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder; . . .

coming under the denomination of real estate." *Blacks Law Dictionary* 1096 (5th ed 1979); *see McGlathery's Estate*, 311 Pa. 351, 353, 166 A. 886, 887 (1933). Even contractual rights involving real estate such as mortgages and leases (*a fortiori*, licenses) are not "real" but "personal" property in Pennsylvania, *In re Bristol Associates, Inc.*, 505 F.2d 1056, 1059 n. 4 (3d Cir. 1974).

Nothing requires that personal property be tangible. Bundles of rights evidenced by certificates such as patents, trademarks, copyrights, and liquor licenses are all personal property, and all are subject to Article Nine interests. § 9–106 (Comment); *Bogus v. American National Bank of Cheyenne, Wyo.*, 401 F.2d 458 (10th Cir. 1968); *Paramount Finance Co. v. U. S.*, 379 F.2d 543 (6th Cir. 1967). The inescapable conclusion is that if a ticket is property, it can only be personal property, and therefore a security interest may attach to the proceeds of its sale, unless another Code provision creates an exclusion. *Cf. York v. Ottusch*, 412 F.Supp. 819, 822–23 (W.D.Wis.1976) (security interest in ticket proceeds from rock concert).

Consequently the first requirement for Article Nine coverage, "personal property," is met. The second requirement is that the transaction not be excluded from coverage by Section 9–104(j), the only restrictive provision of any possible application.

## SECTION 9–104(j) EXCLUSION

The Third Circuit in *In re Bristol Associates, Inc., supra* at 1061, held that Section 9–104(j) narrowed the range of "personal property" subject to Article Nine, and was not merely repetitive. Section 9–104(j) states that Article Nine does not apply: "to the creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder. . ." Thus, for example, a security interest in a mortgage or lease, although it is otherwise held in Pennsylvania to be personal property, is not covered by Article Nine, because Section 9–104(j) specifically excludes it, *In re Bristol Associates, Inc., supra.*

The tickets and everything they embody or stand for never lose their essential character as personal property. Whatever specific code classifications of personal property describe the concept of a ticket at the various stages of its existence, the fact of their being personalty never changes. We need not be concerned to affix any specific label such as "inventory", "account receivable", "contract right" or "general intangible" to the ticket. The Bank's "security interests in all of Borrower's personal property and fixtures covered by Article 9 of the Code..."[6] are valid and paramount to create a security interest in tickets and their proceeds, because the property involved is personal and not excluded by Section 9–104(j).

A ticket in its issuer's hands is of two natures: it is both an item of "inventory" and a "general intangible" evidencing rights. When the customer asks to buy a ticket and the teller produces one, offer and acceptance are complete and a contract is created. *See Sparrow v. Airport Parking Co. of America*, 221 Pa.Super. 32, 39, 289 A.2d 87, 91 (1972). The purchaser receives a "general intangible" in the nature of a license to come onto the raceway premises and a right to view a performance (the race). *See* § 9–106 (Comment). The raceway simultaneously acquires an account receivable which is immediately converted into proceeds. The path from inventory to intangible to account receivable to proceeds is a continuous and uninterrupted metamorphosis, through which the security interest remains intact and perfected. § 9–303(3).

The Official Comment to Section 9–101 gives an indication that the drafters hoped that Article Nine would reduce the difficulty of dealing with collateral in transition and novel forms of collateral. Pre-Code law, which the Code's author hoped to replace, was unable in many instances to keep up with evolving commercial requirements because of its inflexibility. For instance, the Comment notes that under pre-Code doctrine:

6. *See* note 2 *supra.*

It is often baffling to try to maintain a technically valid security interest when financing a manufacturing process, where the collateral starts out as raw materials, becomes work in process and ends as finished goods. Furthermore, it is by no means clear, even to specialists, how under present law a security interest may be taken in many kinds of intangible property—such as television or motion picture rights—which have come to be an important source of commercial collateral.

Glorifying formalism by giving a narrow construction to "general intangible" would contribute to, rather than alleviate, this sort of bafflement, and defeat the purpose of Article Nine.

It is utterly inconceivable that lenders to ticket-selling businesses would not routinely look to these borrowers' principal source of income—ticket sales—as collateral for loans. The lack of litigation on the point seems more likely to indicate the obviousness of this form of secured financing rather than its oddity. To exclude such financing from the ambit of Article Nine would lack any basis in logic, law, or commercial reality, and this court will not create such an anomaly in the comprehensive scheme of the Code.[7]

## ADEQUATE DESCRIPTION

The full text of paragraph 2 of the Security Agreement has already been reproduced here. As previously noted, the Agreement "grants or confirms" security interests in "all of Borrower's [Pocono's] personal property and fixtures covered by Article 9 of the Code (the 'Collateral')." It further states that "[w]ithout limiting the generality of the foregoing" the security interests extend to all of Pocono's presently held or after-acquired: inventory and accessions, equipment and accessions, fixtures, accounts receivable, general intangibles, chattel paper, documents, instruments, deposit accounts, money, and "proceeds and products of the foregoing".

7. Brief for Appellant at 21.

## REASONABLE IDENTIFICATION

There is no basis whatsoever for a finding of insufficiency here. Under Section 9–203(1)(b) and Section 9–110 the description of collateral in a security agreement is sufficient, whether or not it is specific, if it "reasonably identifies what is described." This test should be essentially the same for a security agreement as for a financing statement. White & Summers, *Handbook of the Uniform Commercial Code*, (1972) at 788–79. The lower court correctly concluded that the financing statement filed in this case was sufficient, but erred in holding that the Security Agreement did not "reasonably identify" the scope of the Bank's interest.

We agree with the Bank's assertion that its identification in the Security Agreement of all personal property covered by Article Nine, amplified by a listing of all possible Code categories of personal property, should suffice.[8]

In *In re Emergency Beacon Corp.*, 23 U.C.C.Rep.Serv. 766, 770 (S.D.N.Y.1977), the District Court explicitly held that "a security agreement providing for a secured interest in 'general intangibles' would provide adequate notice" of a creditor's interest in a tradename. The opinion also suggested that the categories of "accounts" and "contract rights" would be sufficient descriptions in a security agreement. This conclusion makes sense in view of the wide variety of entities which fall into the "catchall" category of general intangibles. Further specificity would be burdensome and would require amendment of the security agreement and financing statements every time the debtor acquired a new income-generating right.

There might be a policy in favor of requiring more detail than is provided by the Code categories when the actual interest acquired is only partial and confusion might other-

8. From an academic point of view, whether the description of collateral in a security agreement is sufficient to satisfy the requirements of UCC §§ 9–110 and 9–203 is a question separate and distinct from that of whether the description is sufficient to include specific items.
   *See* "Collateral in Security Agreement," 100 A.L.R.3d 940, at 946 (1980).

wise be promoted. *See, e. g., Aronson Furniture Co. v. Johnson*, 21 U.C.C.Rep.Serv. 1424, 1428, (Ill.App.1977); *In re Fairway Wholesale, Inc./Milhender Distributing Co. v. Fairway Wholesale, Inc.*, 21 U.C.C.Rep.Serv. 1429, 1433 (D.Conn. 1977). Such a policy would be totally inapplicable when the visible and manifested intention of the parties is to convey a security interest as broad as Article Nine will allow in every eligible form of personal property, as this Agreement did.

The Order of November 6, 1978 is hereby REVERSED and the sheriff levy of July 30, 1978 is set aside.[9]

9. Pa.R.C.P. No. 3121(d) provides:
(d) The court may on application of any party in interest set aside the writ, service or levy
(1) for a defect therein;
(2) upon a showing of exemption or immunity of property from execution, or
(3) upon any other legal or equitable ground therefor.