Ronald A. YOCCA, Paul Serwonski and Patty Serwonski, his wife; and Ronald P. Carmassi, individually and on behalf of all similarly situated, Appellants,

v.

The PITTSBURGH STEELERS SPORTS, INC., a National Football League Franchise, t/d/b/a The Steelers Pittsburgh Football Club, and Sports & Exhibition Authority of Pittsburgh & Allegheny County.

Commonwealth Court of Pennsylvania.

Argued May 8, 2002.

Decided Aug. 28, 2002.

W.J. Helzlsouer, Dravosburg, for appellants.

Mark R. Hornak, Pittsburgh, for appellee, Sports & Exhibition Auth. of Pittsburgh and Allegheny County.

Michael J. Manzo, Pittsburgh, for appellee, Pittsburgh Steelers Sports, Inc.

Before FRIEDMAN, Judge, COHN, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge FRIEDMAN.

This is an appeal from an order of the Court of Common Pleas of Allegheny County (trial court), dated December 28, 2001, which sustained the preliminary objections of The Pittsburgh Steelers Sports, Inc., a National Football League Franchise, t/d/b/a The Steelers Pittsburgh Football Club (Steelers) and the Sports & Exhibition Authority of Pittsburgh & Allegheny County (Authority) (together, Defendants), and dismissed the third amended class action complaint (Complaint) filed by Ronald A. Yocca; Paul Serwonski and Patty Serwonski, his wife; and Ronald P. Carmassi, individually and on behalf of all similarly situated persons (Plaintiffs), who purchased "stadium builder licenses" (SBLs) from Defendants. We reverse in part and affirm in part.

In their Complaint, Plaintiffs allege that Defendants issued a brochure (SBL Brochure) soliciting Plaintiffs to purchase SBLs for a new professional football stadium, now known as Heinz Field. (Complaint, ¶¶ 7, 14, and 15.) The SBL Brochure indicates that those who purchased SBLs would be making a one-time contribution to the cost of building the new stadium. In return, the SBL purchasers would be assigned to a particular seating area (Section) in the stadium and would have the right to buy season tickets in that Section for as many seasons as they wished. They also would have the right to determine who gains control of the season tickets for their seats in the future. (SBL Brochure, R.R. at 37a.) The actual seat assignments were to be made after the seats were physically installed in the stadium. (SBL Brochure, R.R. at 38a.)

The price of the SBLs ranged from $250.00 to $2700.00, depending on which Section the purchaser wished to sit in. (SBL Brochure, R.R. at 35a–36a.) The SBL Brochure contained colored diagrams of the planned stadium showing the various Sections and showing the yard-lines of the playing field. The SBL Sections were designated A, B, C, D, E, F, Club I and Club II. (SBL Brochure, R.R. at 35a–36a.)

The penultimate page of the SBL Brochure was headed "Before you sign" and contained the following text:

Use the application on the next page to order Stadium Builder Licenses (SBLs) or season tickets in non-SBL Sections for the same number or fewer season tickets as you currently hold.

You may apply for any Section you wish as your first preference. To ensure fair-

ness, every application received by the November 30 deadline will be assigned a random computerized priority number and that priority number will be used to assign both sections and seats.

**Stadium Builder Licenses (SBLs)**

If you are ordering SBLs, you will be mailed a contract by the end of March 1999, notifying you of your Section assignment. The contract must be signed and returned within 15 days. If the completed contract is not returned as required, your season ticket holder discount, seating priority and deposit will be forfeited.

**Same Seating Area Preference**

Current season ticket holders who apply for [an] SBL Section that corresponds with their current seat location in Three Rivers Stadium will be the first assigned to that Section. If that is your choice, we will try to assign seats as close to your current seat location as the new stadium seating configuration will allow. All other seats in a given SBL Section will be assigned using the random priority number. Assignment of your first preference is not guaranteed.

(SBL Brochure, R.R. at 39a.)

The last page of the SBL Brochure was an application form (Application) that interested parties were to fill out, indicating their first, second, and third Section choices. (*See* R.R. at 89a.) Purchasers were to make payment for the SBLs in three equal installments: a nonrefundable one-third deposit was due with the Appli-

cation; the second installment was due in October 1999; and the third installment was due in October 2000. (SBL Brochure, R.R. at 38a.) Plaintiffs allege that they completed the Application, sent it to Defendants with the required deposit, and completed payment of the SBL fees according to the terms of the contract. (Complaint, ¶¶ 25, 40–41, 56–57.)

Plaintiffs allege that Defendants mailed two documents to the SBL applicants in October 1999, an "SBL Agreement" and "Additional Terms."[1] The SBL Agreement incorporates by reference the Additional Terms, which, in turn, contains an integration clause, stating that "This Agreement contains the entire agreement of the parties with respect to the matters provided for herein and shall supersede any representations or agreements previously made or entered into by the parties hereto." (R.R. at 101a.) Plaintiffs allege that they signed the SBL Agreement and paid the remaining installments for their SBLs. (Complaint, ¶¶ 25–26, 41–42, 57–58.)

Plaintiffs allege that when they took their seats in Heinz Field for the first time,[2] they realized that Defendants had enlarged some of the SBL Sections, causing their individual seats to be "shifted both horizontally away from the [fifty] yard-line and vertically away from the field." (Plaintiffs' brief at 10.) Therefore, their seats were outside the SBL Sections as depicted in the SBL Brochure, upon which they relied when they filled out their Applications.

---

1. The first document was entitled "Stadium Builder License Agreement," or, if the applicant was assigned to club seats, "Stadium Builder License and Club Seat Agreement," containing similar provisions. (Complaint, ¶ 22.) For simplicity, we will refer to this document as the "SBL Agreement." The second document was a separate, four-page document entitled "Additional Terms and Conditions of Stadium Builder License" or "Additional Terms and Conditions of Stadium Builder License and Club Seat Agreement." (Complaint, ¶ 22.) We will refer to this document as the "Additional Terms."

2. From this allegation, we can infer that Plaintiffs purchased season tickets for the first season played at Heinz Field.

For example, Representative Plaintiff Ronald A. Yocca applied for and was awarded two SBLs for the Club I Section. Based on the diagram in the SBL Brochure, (SBL Brochure, R.R. at 35a), Plaintiffs allege that Yocca reasonably believed that Club I Section seats would be somewhere between the twenty-yard lines. (Complaint, ¶ 29.) However, Yocca's seats turned out to be at the eighteen yard-line. (Complaint, ¶ 31.) The Complaint alleges that

> By expanding the size of the Club [I] Section, Defendants have improperly overcharged SBL holders actually sitting in Club [II] the annual seat fee of Club [I]. Subject to verification in discovery, Plaintiffs believe and therefore aver that the additional revenue generated in the [expanded Club I Section] will exceed $650,000.00 per year for the life of the stadium.

(Complaint, ¶ 34.) In other words, Plaintiffs allege that Yocca is being forced to pay the Club I price for seats that, according to the SBL Brochure, should have been considered part of the Club II Section. Furthermore, this alleged injury to Yocca will continue for as long as he purchases season tickets.

Representative Plaintiffs Paul and Patty Serwonski were granted two SBLs for Section D, which is in the upper deck of the stadium. Ronald P. Carmassi also was granted two SBLs for Section D. The diagram in the SBL Brochure shows the upper deck as being divided into three equal Sections: D, E and F, with D being the closest to the playing field and F being the farthest away from the playing field. (SBL Brochure, R.R. at 36a.) Plaintiffs allege that the upper deck of the stadium

has thirty-six rows, meaning that a person assigned to Section D should not be seated any further back than row twelve. (Complaint, ¶¶ 45 and 61.) However, both the Serwonskis' seats and Carmassi's seats turned out to be in the sixteenth row. (Complaint, ¶¶ 47 and 63.) Plaintiffs allege that by expanding the size of the D Section, Defendants have improperly overcharged some SBL holders actually sitting in the E Section the price of SBLs for Section D. (Complaint, ¶¶ 50 and 66.)

The Complaint includes counts alleging: (1) breach of contract; (2) negligent misrepresentation and fraud; and (3) violation of the Unfair Trade Practices and Consumer Protection Law (UTPCPL).[3] Plaintiffs seek relief in the form of compensatory damages, declaratory judgment, injunctive relief, punitive damages and attorneys' fees.

The Steelers and the Authority each filed preliminary objections, which included demurrers and motions to dismiss. The trial court sustained the preliminary objections and dismissed Plaintiffs' Complaint in its entirety. The trial court dismissed Plaintiffs' breach of contract claim on the basis that it was barred by the parol evidence rule. The trial court dismissed Plaintiffs' claim of negligent misrepresentation and fraud on the basis that it was barred by the "gist of the action" doctrine. The trial court dismissed Plaintiffs' claim of violation of the UTPCPL on the basis that the sale of SBLs does not fall within the UTPCPL's definition of "goods or services." The trial court also rejected Plaintiffs' claims for declaratory and injunctive relief.

Plaintiffs now appeal from the trial court's order dismissing their Complaint.[4]

---

3. Act of December 17, 1968, P.L. 1224, *as amended*, 73 P.S. §§ 201–1—201–9.2.

4. Our scope of review of an appeal from an order sustaining preliminary objections in the nature of a demurrer is to determine whether on the facts alleged in the complaint, the law

## I. Breach of Contract

Plaintiffs first argue that the trial court erred in concluding that their claim for breach of contract is barred by the parol evidence rule. We agree.

 Under the "parol evidence rule," where the parties to a contract have embodied their agreement in a single memorial, which they regard as the final expression of that agreement, all other utterances, prior to or contemporaneous with the making of the memorial, are immaterial for the purpose of determining the terms of the contract. *Friestad v. Travelers Indemnity Company*, 260 Pa.Super. 178, 393 A.2d 1212 (1978). If an agreement contains an integration clause, the parol evidence rule is particularly applicable. *1726 Cherry Street Partnership v. Bell Atlantic Properties, Inc.*, 439 Pa.Super. 141, 653 A.2d 663 (1995), *appeal denied*, 544 Pa. 647, 664 A.2d 976 (1995).

Here, the trial court concluded that the parol evidence rule barred Plaintiffs' claim for breach of contract because the SBL Agreement contained an integration clause. However, Plaintiffs argue, and we agree, that their contracts with Defendants were not finally embodied in the SBL Agreement. Indeed, their contracts with Defendants were formed well before Defendants mailed out the SBL Agreement and Additional Terms, and the new provisions contained in those two documents constituted unilateral and, therefore, unenforceable, changes to the contract terms.

states with certainty that no recovery is possible. In making this review, we must accept as true all well-pled allegations of material fact averred in the complaint, as well as all inferences reasonably deduced therefrom. Any doubts must be resolved in favor of overruling the demurrer.

 A contract is formed when there is an offer, an acceptance of that offer and an exchange of consideration. *Hartman v. Baker*, 766 A.2d 347 (Pa.Super.), *appeal denied*, 564 Pa. 712, 764 A.2d 1070 (2000). Once these three elements are present, the contract is formed, even if the parties intend to reduce their agreement to a single writing with additional terms at a later date. *Id.* Once a contract has been formed, its terms may be modified only if both parties agree to the modification and the modification is founded upon valid consideration. *Corson v. Corson's Inc.*, 290 Pa.Super. 528, 434 A.2d 1269 (1981). The terms of a contract cannot be modified by unilateral action. *Apgar v. State Employees' Retirement System*, 655 A.2d 185 (Pa. Cmwlth.1994).

 Applying the above principles of contract law to this case, we are struck by one important fact alleged in the Complaint: *The SBL Applications had to be accompanied by a non-refundable deposit when they were mailed in.* Because the SBL applicants had remitted the first one-third of their payment for the SBLs, and because they could not get that money back, the contract was complete at that point. In other words, the SBL Brochure was the offer, the mailing of the Application was acceptance of the offer, and the non-refundable exchange of money for the SBLs was the consideration.

 Even if the SBL Agreement superceded the original contract, Plaintiffs allege that when they accepted that Agreement by signing it and paying their additional installments, such acceptance

*Dynamic Sports Fitness Corporation. of America v. Community YMCA*, 768 A.2d 375, 377 (Pa.Cmwlth.2001), *appeal denied*, 568 Pa. 707, 796 A.2d 986 (2002) (citations omitted).

was still based on the terms set forth in the SBL Brochure.[5] Thus, according to Plaintiffs, the SBL Agreement and Additional Terms, mailed out after the original contract had been formed, contained unilateral, unbargained-for changes to the terms of the contract that cannot be overcome by including an integration clause.

■ A demurrer is not proper unless the law states with certainty that no recovery is possible on the facts alleged in the complaint. *Dynamic Sports Fitness Corporation of America, Inc. v. Community YMCA of Eastern Delaware County*, 768 A.2d 375 (Pa.Cmwlth.2001), *appeal denied*, 568 Pa. 707, 796 A.2d 986 (2002). We must accept as true all well-pled allegations of material fact averred in the complaint, as well as all inferences reasonably deduced therefrom. Any doubts must be resolved in favor of overruling the demurrer. *Id.* Because we do not believe that the parol evidence rule necessarily bars Plaintiffs'

count alleging breach of contract, and because we cannot say that Plaintiffs cannot possibly recover on the facts alleged in the complaint, we conclude that the trial court erred in dismissing Plaintiffs' claim for breach of contract.

Accordingly, we reverse that portion of the trial court's decision dismissing Plaintiffs' claim for breach of contract.

## II. Negligent Misrepresentation and Fraud

Plaintiffs next argue that the trial court erred in concluding that their tort claim for negligent misrepresentation and fraud is barred by the "gist of the action" doctrine. We disagree.

■ As a general rule, courts are reluctant to permit tort recovery for breach of contract. *Grode v. Mutual Fire, Marine and Inland Insurance Company,*

---

5. The record indicates that, at some point, the Steelers' issued a second diagram of the proposed stadium seating plan that differed slightly from the diagram contained in the SBL Brochure. (*See* Exhibit C to Plaintiffs' Brief in Opposition to Preliminary Objections Filed by the Defendants, R.R. at 127a.) According to Plaintiffs, an unlabeled black and white diagram was attached to an August 1999 letter sent to SBL applicants notifying them that they had been granted an SBL, (Plaintiffs' brief at 10.), but that diagram is "less sophisticated" than the seating chart in the SBL Brochure, "bears no verisimilitude to the SBL Sections as finally assigned" and "was never agreed to by the SBL Holders." (Plaintiffs' Reply Brief at 6–7.) The trial court opinion states that a second diagram was attached to the SBL Agreement itself, which was mailed in October 1999, (trial court op. at 3). Indeed, the SBL Agreement refers to an "Exhibit A" in relation to the "Stadium Seating Area." However, we cannot find any such document in the record, and, despite the Steelers' claim to the contrary, (Steelers' brief at 11, n. 7), the Plaintiffs specifically deny that the Steelers have ever tendered any document marked "Exhibit A"

to the SBL Holders. (Plaintiffs' Reply Brief at 7.) In short, the record is unclear, and the parties do not agree, on what significance, if any, this second diagram has to Plaintiffs' claim.

As noted previously, our scope of review of the trial court's decision on preliminary objections limits us to a determination of whether, assuming the truth of all facts alleged in Plaintiffs' third amended complaint, the law states with certainty that no recovery is possible. Plaintiffs' third amended complaint makes no reference whatsoever to the existence of a second diagram. Indeed, Plaintiffs allege in their brief to this court that they always relied on the diagram in the SBL Brochure and that they did not realize that the seating sections had been reconfigured until they took their seats in the new stadium for the first time. (Plaintiffs' brief at 10.) Therefore, it is outside this court's scope of review to consider the second diagram or address what significance, if any, the second diagram has to Plaintiffs' case. Any significance attached to the second diagram is a factual determination to be made by the trial court on remand.

154 Pa.Cmwlth. 366, 623 A.2d 933 (1993). The reason for this reluctance is that:

Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals. . . . To permit a promisee to sue his [or her] promisor in tort for breaches of contract inter se would erode the usual rules of contractual recovery and inject confusion into our well-settled forms of actions.

*Bash v. Bell Telephone Company of Pennsylvania*, 411 Pa.Super. 347, 601 A.2d 825, 829 (1992) (quoting *Iron Mountain Security Storage Corporation v. American Specialty Foods, Inc.*, 457 F.Supp. 1158, 1165 (E.D.Pa.1978)).[6]

■■■ However, there are some limited circumstances under which a plaintiff may have an actionable tort claim despite having a contractual relationship with the defendant. *Id.* Some cases, particularly those decided in federal courts but based on Pennsylvania law, apply the "gist of the action" test that the trial court used in this case. Other cases employ a misfeasance/nonfeasance test.

The "gist of the action" test has been described as follows:

When a plaintiff alleges that the defendant committed a tort in the course of carrying out a contractual agreement, Pennsylvania courts examine the claim and determine whether the "gist" or gravamen of it sounds in contract or tort; *a tort claim is maintainable only if the contract is "collateral" to conduct that is primarily tortious.*

*Sunquest Information Systems, Inc. v. Dean Witter Reynolds, Inc.*, 40 F.Supp.2d 644, 651 (W.D.Pa.1999).

This court generally employs a slightly different test, known as the misfeasance/nonfeasance test. Under this test, we determine if there exists a cause of action in tort growing out of a breach of contract based on "whether there was an improper performance of a contractual obligation (misfeasance) rather than the mere failure to perform (nonfeasance)." *Grode*, 623 A.2d at 935 (quoting *Raab v. Keystone Insurance Company*, 271 Pa.Super. 185, 412 A.2d 638 (1979), *appeal dismissed*, 496 Pa. 414, 437 A.2d 941 (1981)).

As we noted in *Grode*, the "gist of the action" test and the misfeasance/nonfeasance test tend to achieve the same results, as both require the court to analyze how much the claims in the pleadings relate to the contracts involved. If there is "misfeasance," there is an improper performance of the contract in the course of which the defendant breaches a duty imposed by law as a matter of social policy. In such instances, the "gist" of the plaintiff's action sounds in tort and the contract itself is collateral to the cause of action. On the other hand, if there is "nonfeasance," the wrong attributed to the defendant is solely a breach of the defendant's duty to perform under the terms of the contract. In such instances, the "gist" of the plaintiff's action sounds in contract, and the plaintiff would not have a cause of action but for the contract.

■■■ We agree with the trial court that, here, the "gist" of plaintiff's action sounds in contract, not tort, because the tort claim is based on precisely the same conduct that Plaintiffs assert is a breach of the

---

**6.** Superceded by rule on other grounds as stated in *Keefer v. Keefer,* 741 A.2d 808 (Pa.Super.1999).

contract, and the duties that Defendants are accused of violating arise, if at all, only because the parties entered into a contract. Put in terms of the misfeasance/nonfeasance test, the Plaintiffs here allege nonfeasance, that Defendants failed to perform the contract as agreed, not that Defendants violated any duty other than their duty to perform under the contract.

We therefore affirm the trial court's decision to dismiss Plaintiffs' claim for negligent misrepresentation and fraud.

### III. Declaratory Relief

■ Plaintiffs next argue that the trial court erred in dismissing their claim for declaratory relief. We agree.

In their Complaint, Plaintiffs requested the trial court to declare the integration clause, and any other provisions in the Additional Terms that materially alter the contract, void and unenforceable for want of consideration. (R.R. at 76a.) In the alternative, Plaintiffs requested that the trial court "declare the [SBL B]rochure and terms set forth therein as integrated in the contract by virtue of the specific references to the set SBL Section locations as defined by the [SBL B]rochure." (R.R. at 76a.)

The trial court dismissed Plaintiffs' request for declaratory relief on the ground that it was unnecessary to determine whether the Additional Terms were supported by consideration because Paragraph fifteen of the Additional Terms states that "This agreement shall be binding upon and inure to the benefit of the parties hereto and their permitted successors and assigns." [7] Relying on section 1 of the Uniform Written Obligations Act (Act),[8] the trial court stated that "By signing the SBL Agreements, Plaintiffs acknowledge[d] the binding nature of the contract." (Trial court op. at 7.)

■ We agree with the trial court that, based on section 1 of the Act, the Additional Terms cannot be found void and unenforceable for lack of consideration. However, the Act serves to save a document from unenforceability *only* for lack of consideration. It does not remove other defenses to enforcement of the agreement. *See, e.g., First Federal Savings and Loan Association v. Reggie*, 376 Pa.Super. 346, 546 A.2d 62 (1988). Here, the trial court completely overlooked Plaintiffs' alternate request, that, if the integration clause is valid, the terms of the SBL Brochure be declared as integrated into the SBL Agreement.[9] Because the law does not state with certainty that no recovery is possible on Plaintiffs' *alternate* request for declaratory relief, the trial court erred in dismissing this request.

---

7. This clause appears at Paragraph 16 of the Additional Terms and Conditions to the Club Seat License Agreement. (R.R. at 141a.)

8. Section 1 of the Act of May 13, 1927, P.L. 985, 33 P.S. § 6, provides that "[a] written release of promise, hereafter made and signed by the person releasing or promising, shall not be invalid or unenforceable for lack of consideration, if the writing also contains an additional express statement, in any form of language, that the signer intends to be legally bound."

9. Plaintiffs' Complaint alleges that the Plaintiffs did not know that Defendants had expanded the seating areas until Plaintiffs took their seats for the first time. We can infer from this allegation that Plaintiffs did not know Defendants had unilaterally changed the contracts at the time Plaintiffs signed the SBL Agreement. According to Plaintiffs, they were relying on the terms being the same as in the Brochure when they signed the SBL Agreements. In this action, Plaintiffs seek a declaration from the court that any new or changed terms in the SBL Agreements are void and unenforceable and the terms set forth in the Brochure should be deemed the true terms of the contract.

Accordingly, we reverse the trial court's decision insofar as it dismissed Plaintiffs request for declaratory relief.

## IV. Injunctive Relief

Plaintiffs next argue that the trial court erred in dismissing their request for injunctive relief.[10] We disagree.

■■■■ In order to prevail on a petition for a permanent injunction, the party seeking the injunction must establish that the right to relief is clear, that there is an urgent necessity to avoid an injury which cannot be compensated for by damages, and the greater injury will result from refusing rather than granting the relief requested. *P.J.S. v. Pennsylvania State Ethics Commission,* 669 A.2d 1105 (Pa. Cmwlth.1996). Injunctive relief is not available where there is an adequate remedy at law. *Id.*

■■■ According to Plaintiffs, injunctive relief is appropriate here because the right to control seats for Steelers' games is "priceless," especially because Heinz Field is sold out, with a ten-year waiting list. We appreciate the frustration and disappointment that Plaintiffs, as dedicated Steelers fans, must have felt when they came to believe that their seat assignments were made unfairly and in violation of the SBL Agreement. However, we conclude

that any injury alleged by Plaintiffs can be adequately compensated by money damages,[11] and, therefore, that injunctive relief is not appropriate in this case.

Moreover, we do not believe that greater injury would result from refusing rather than granting Plaintiffs' request for an injunction ordering Defendants to reissue "all seat licenses and all season ticket seats." To the contrary, the granting of such injunctive relief would disturb the seating assignments of thousands of fans who may be as satisfied with their seats as Plaintiffs are dissatisfied. Inevitably, this would lead to the filing of additional lawsuits, prolonging the outcome of this litigation.

For these reasons, we conclude that the trial court acted properly in dismissing Plaintiffs request for injunctive relief, and we affirm the trial court's decision to that extent.

## V. Unfair Trade Practices

■■■ Finally, Plaintiffs argue that the trial court erred in dismissing their claim under the UTPCPL. According to Plaintiffs, SBLs are not "licenses" in the true sense of the word and, therefore, they should be considered "goods or services" within the meaning of the UTPCPL.[12]

---

10. Plaintiffs' Complaint seeks injunctive relief to "enforce the terms of the contract, and to require that all seat licenses and all season ticket seats be reissued in accordance with the agreed upon priority." (Complaint, ¶ 85; R.R. at 71a.)

11. Count VIII of Plaintiffs' Complaint seeks injunctive relief and, in the alternative, rescission of their contracts with Defendants and restitution of all money paid, plus interest and attorneys' fees. (Complaint, ¶ 86; R.R. at 71a.) Although this alternative prayer for relief is included in Count VIII of the Complaint, the compensatory and consequential damages, interest, costs, and attorneys fees that Plaintiffs seek in Count VII, Plaintiffs'

count for breach of contract, remain available to Plaintiffs.

12. Section 9.2(a) of the UTPCPL, 73 P.S. § 201–9.2(a) (emphasis added) provides that:

Any person who *purchases or leases goods or services primarily for personal, family or household purposes* and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater....

The SBL Agreement describes the relationship between the parties as one of "licensor" and "licensee," (R.R. at 72b, 80b); however, we are not bound by the nomenclature the parties attach to their relationship. *J. Miller Co. v. Mixter*, 2 Pa.Cmwlth. 229, 277 A.2d 867 (1971). We agree with Plaintiffs that SBLs are not licenses in the true sense of the word. A "license" is generally defined as a "revocable permission to commit some act that would otherwise be unlawful." Black's Law Dictionary 931 (7th Ed.1999). Because not purchasing Steelers' season tickets plainly is not an unlawful activity, SBLs do not fit this definition.

Instead, we conclude that the SBLs are a classic example of an option contract, which is a contract to keep an offer open. *Schecter v. Watkins*, 395 Pa.Super. 363, 577 A.2d 585 (1990), *appeal denied*, 526 Pa. 638, 584 A.2d 320 (1990). Here, Plaintiffs have purchased the right to buy season tickets in a certain Section of the stadium for as many consecutive seasons as they wish. In other words, by purchasing SBLs, the Plaintiffs paid Defendants to keep open an offer to sell them season tickets; this is an entirely different transaction than the purchase of season tickets.

The proper question before the trial court should have been whether an option contract conceivably falls within the scope of "goods or services" for purposes of the UTPCPL. Goods are defined as "tangible or movable personal property other than money." Blacks Law Dictionary 701 (7th Ed.1999). Because the option to purchase season tickets is not tangible or movable property, the SBLs clearly are not "goods." A service, on the other hand, is defined as "the act of doing something useful for a person or company for a fee." Blacks Law Dictionary 1372 (7th Ed.1999). In light of this definition, we cannot say with certainty that the option contracts here cannot be considered a "service" as under the UTPCPL. Therefore, we conclude that the trial court's dismissal of Plaintiff's action under the UTPCPL was improper at this preliminary objection stage, and, accordingly, we reverse the trial court's dismissal of Plaintiffs' action under the UTPCPL.

For all of the above reasons, we reverse the decision of the trial court in part and affirm that decision in part.

Judges McGINLEY and LEAVITT did not participate in the decision in this case.

### ORDER

AND NOW, this 28th day of August, 2002, the order of the Court of Common Pleas of Allegheny County (trial court), dated December 28, 2001, which dismissed the third amended class action complaint is hereby reversed insofar as it dismisses Ronald A. Yocca; Paul Serwonski and Patty Serwonski, his wife; and Ronald P. Carmassi's (Plaintiffs) claim for breach of contract, Plaintiffs' requests for declaratory relief, and Plaintiffs' claim for violation of the Unfair Trade Practices and Consumer Protection Law. Defendants, the Pittsburgh Steelers Sports, Inc., a National Football League Franchise, t/d/b/a The Steelers Pittsburgh Football Club and the Sports & Exhibition Authority of Pittsburgh & Allegheny County, shall file a timely answer to the above portions of Plaintiffs' Complaint. The decision of the trial court, insofar as it dismisses Plaintiffs' claims for negligent misrepresentation and fraud and injunctive relief, is affirmed.

Concurring and Dissenting Opinion by Judge COHN.

I concur with the reasoning in parts II and IV of the majority opinion. I dissent from parts I, III and V of the majority opinion.

**948**

Regarding the breach of contract claim, Part I, I disagree with the majority that plaintiffs may have a breach of contract claim. The trial court was faced with a demurrer. A demurrer may only be sustained when, on the face of the complaint, the law will not permit recovery. *Stone and Edwards Insurance Agency, Inc. v. Department of Insurance*, 151 Pa.Cmwlth. 266, 616 A.2d 1060 (1992), *affirmed*, 538 Pa. 276, 648 A.2d 304 (1994). All well-pled allegations must be accepted as true. *Id.* When considering preliminary objections in the nature of a demurrer, our scope of review is to determine whether, on the facts alleged, the law states with certainty that no recovery is possible. *Rouse & Associates–Ship Road Land Limited Partnership v. Pennsylvania Environmental Quality Board*, 164 Pa.Cmwlth. 326, 642 A.2d 642 (1994).

In examining plaintiffs' third amended complaint, it is clear that their allegation is that the brochure should be regarded as the contract. The brochure stated

> Current season ticket holders who apply for a SBL [Stadium Builder License] Section that corresponds with their current seat location in Three Rivers Stadium will be the first assigned to that Section. If that is your choice, **we will try** to assign seats as close to your current seat location as the new stadium seating configuration will allow. All other seats in a given SBL Section will be assigned using the random priority number. Assignment of your first preference is not guaranteed.

(Plaintiff's Third Amended Complaint, Para. 16) (emphasis added).

A contract requires a promise. *Ringgold School District v. Abramski*, 57 Pa. Cmwlth. 33, 426 A.2d 707 (1981). According to *Corbin on Contracts*, § 1.15 (1993), "[a] person may express an intention to do something in the future without promising to do it." Further, "A promise is an expression of intention, but it is not every expression of intention that can properly be called a promise. An expression of intention is not a promise unless it is communicated to one or more persons under such circumstances that they will expect performance and may reasonably act in reliance upon the expression." *Id.* Here, the trial court concluded that as a matter of law plaintiffs' reliance on the language of the brochure and the accompanying diagram was *not* reasonable. I agree. First, defendants did nothing more than promise to try to seat people where they wished to be. Second, the accompanying diagram, when viewed in tandem with the brochure, indicates that seating would be as close to the patron's original seating as the new configuration would allow, making it clear that the configuration would not be a carbon copy of the old stadium. Third, since the building of the new stadium had not even begun, reliance on a general diagram that contained no clear objective components from which one could construe exactly where a section would begin and end, much less where individual seats would be, is, in my view, unreasonable reliance as a matter of law.[1] Thus, I would hold that no

**1.** Further, in my view, by ignoring the correspondence they received in August, with the corresponding modified diagram, plaintiffs seem to run afoul of the principle that "failure to read [the contract] is an unavailing excuse or defense and cannot justify an avoidance, modification or nullification of the contract or any provision thereof." *Estate of*

*Olson*, 447 Pa. 483, 488, 291 A.2d 95, 98 (1972), (quoting *Orner v. T.W. Phillips Gas & Oil Co.*, 401 Pa. 195, 199, 163 A.2d 880, 883 (1960)). I additionally note that plaintiffs, upon receiving the diagram, had at least one month to consider whether to proceed with the agreement and to make any inquiry as to the differing diagrams.

cause of action in contract has been pled.[2]

Regarding the related count for declaratory judgment discussed in Part III of the majority opinion, wherein plaintiffs sought a ruling that the brochure and original diagram should be integrated with the later signed agreement, because I conclude that the brochure contained no promise as a matter of law, integrating it would not be helpful to plaintiffs' case. Therefore, while I agree with the majority that the trial court should have ruled on this alternative request, its failure to do so was harmless error.

Regarding Part V, I respectfully disagree with the majority's conclusion as to the unfair trade practices claim. The majority concludes that "SBLs are not 'licenses' in the true sense of the word and, therefore, they should be considered 'goods or services' within the meaning of UTPCPL [Unfair Trade Practices and Consumer Protection Law]."[3] (Majority Opinion at 16–17.) I disagree. I believe that under Pennsylvania law, SBLs are indeed licenses and that, as such, they fall outside the ambit of the UTPCPL. The majority's definition of license, taken from Black's Law Dictionary, is more akin to professional occupational licenses—positions where individuals are granted authorization to engage in specific professional endeavors that, without such authorization, would be illegal to engage in. In contrast, the SBLs are more akin to real property licenses.

In terms of real property, licenses have long been defined by Pennsylvania law to be "an authority to do a particular act or series of acts upon another's land, without possessing any estate therein." *Baldwin v. Taylor*, 166 Pa. 507, 511, 31 A. 250, 251 (1895); *accord Kovach v. General Telephone Co. of Pennsylvania*, 340 Pa.Super. 144, 489 A.2d 883 (1985). An example of such a license is when a person buys a ticket for an event. Tickets for events provide a "purchaser [with] a 'general intangible' in the nature of a license to come onto the . . . premises and a right to view a performance." *Klingner v. Pocono International Raceway, Inc.*, 289 Pa.Super. 484, 433 A.2d 1357, 1362 (1981). Although licenses are sometimes formed orally or implicitly, they may also arise through written, explicit arrangements. As noted by our sister court, "[a] license based on a valuable consideration is a contract, and the rights and obligations of the parties under such a license agreement depend on the provisions thereof." *Sparrow v. Airport Parking Co. of America*, 221 Pa.Super. 32, 289 A.2d 87, 91 (1972) (defining license as the "purely personal privilege

---

**2.** Although I believe the application and brochure did not, as a matter of law, lead to formation of a contract, there is no doubt that execution of the SBL agreement did create a contract.

**3.** Act of December 17, 1968 P.L. 1224, *as amended*, 73 P.S. §§ 201–1–201–9.2.

Appellee correctly notes that private causes of action under the UTPCPL require, as a threshold matter, that plaintiffs have purchased or leased a sale of goods. *See* 73 P.S. § 201–9.2(a); *see generally Algrant v. Evergreen Valley Nurseries Limited Partnership*, 941 F.Supp. 495, 499–501 (E.D.Pa.1996), *affirmed*, 126 F.3d 178, 186–88 (3rd Cir.1997) (finding that UTPCPL does not cover sale of securities because securities are intangibles and are not goods or services). In the case *sub judice*, the majority's analysis implicitly recognizes this. The majority concludes that the SBLs are neither licenses nor goods, but that an SBL may be a service. As a service, plaintiff's UTPCPL claim would be cognizable. The majority does not conclusively indicate that the UTPCPL claim is cognizable, but leaves the issue to be determined by the trial court, presumably after additional discovery has occurred. The majority offers no guidance as to the factual factors the trial court should consider in assessing whether the SBL is indeed a service.

... to do certain acts [on the land in question], but not to exercise exclusive possession and enjoyment for a term specified.") (citation omitted).

In the case *sub judice*, as noted by the trial court, Paragraph 7(a) of the "Additional Terms and Conditions" of the SBL agreement provides that:

> The SBL does not grant or provide Licensee with any ownership or other equity interest in the Stadium or the Steelers. The SBL is a revocable right of personal privilege and does not confer upon Licensee any interest in real property or any leasehold interest in Stadium seats. Licensee's relationship with the Licensor is that of licensee and licensor.

(SBL Agreement.)

I agree with the majority that we are not bound by the nomenclature used by the parties, but from my reading of Pennsylvania law, the nomenclature accurately describes the legal relationship between the parties. Licenses, as used in terms of real or personal property, are neither goods nor services, but are intangible property. The licenses made available by SBLs, as well as the SBLs themselves, are *intangible items not subject to a private* UTPCPL cause of action. Accordingly, I would affirm the trial court ruling as to this issue.

For the foregoing reasons, I would affirm the trial court *in toto*.